MAYOR OF THE CITY OF DETROIT v STATE OF MICHIGAN

JUDICIAL ATTORNEYS ASSOCIATION v STATE OF MICHIGAN

Docket Nos. 201850, 201852. Submitted September 2, 1997, at Detroit. Decided March 3, 1998, at 9:15 A.M. Leave to appeal granted, 457 Mich 882.

The mayor of the city of Detroit and the city brought an action in the Wayne Circuit Court against the state and the Department of Management and Budget seeking a declaration regarding the constitutionality of the provisions of 1996 PA 374 pertaining to the transfer of funding responsibility for the 36th District Court to the city and whether the act violates the notice requirements contained in MCL 21.238(2); MSA 5.3194(608)(2) and MCL 21.235(2); MSA 5.3194(605)(2), because the Legislature did not make an appropriation sufficient to pay for the increase in an activity or service required of the city. The court, Robert J. Colombo, Jr., J., granted summary disposition for the plaintiffs, finding that Act 374 violates the Headlee Amendments, Const 1963, art 9, §§ 25, 29. The defendants appealed. (Docket No. 201850).

The Judicial Attorneys Association (JAA) and the Government Administrators Association (GAA), the collective bargaining representatives of the employees of the Wayne Circuit Court and the Detroit Recorder's Court, brought an action in the Wayne Circuit Court against the state, the Governor, the Attorney General, Wayne County, and the Wayne County Board of Commissioners, alleging that 1996 PA 374 violates the constitution and the public employment relations act (PERA), MCL 423.201 et seq.; MSA 17.455(1) et seq. The county and the county board of commissioners filed a cross-claim against the state, the Governor, and the Attorney General, also alleging certain provisions of Act 374 to be unconstitutional. The court, Robert J. Colombo, Jr., J., granted summary disposition for the county and its board of commissioners, finding that the provisions of Act 374 pertaining to the Detroit Recorder's Court, including those making Wayne County the employer of employees working in the Recorder's Court and those transferring funding obligations to Wayne County, violate the Headlee Amendments. The court also enjoined the state from enforcing Act 374 to the extent that it makes the county a coemployer of JAA and GAA

members, finding a violation of the Separation of Powers Clause, Const 1963, art 3, § 2, where the act provides for the sharing of authority over employment matters by two branches of government. The court also found that the coemployment provisions of Act 374 did not violate the PERA. The state, the Governor, and the Attorney General appealed and the JAA and the GAA cross appealed. (Docket No. 201852). The appeals were consolidated.

The Court of Appeals *held*:

1. Act 374 does not violate the Headlee Amendments. The order in Docket No. 201850 and the part of the order in Docket No. 201852 determining that Act 374 violates the Headlee Amendments must be reversed.

2. The Headlee Amendments do not guarantee that local units' spending levels will not increase from the 1978 base year level. They only guarantee that the state will not reduce its proportion of the necessary costs of existing activities or services, and that the state will pay entirely for necessary costs when it mandates new activities or services or to the extent the state increases the level of an existing activity or service. To compare state aid provided during 1978 and a later year at issue, the "state-to-local" formulation should be applied. This method compares the ratio of total state aid for a required activity to total necessary costs for the required activity in 1978 with the ratio of state aid to an individual local unit for the activity to the necessary costs for that unit for the activity in the year of the challenged funding. Under this formulation, the state is obligated to afford each unit providing the activity or service the same proportion of funding that the state provided on a statewide basis in 1978.

3. The relevant activity or service in these cases is the operation of trial courts.

4. In 1978, state law mandated that local units fund trial courts. In 1978, the local units financed and operated the circuit and district courts and the state subsidized a portion of judicial salaries. Nothing in Act 374 mandates new activities for local units vis-à-vis the state in comparison with 1978. Act 374 continues existing activities and does not increase the level of any activity required of local units. The Headlee Amendments do not directly address state mandates that result in shifts among local units or reductions in post-1978 state subsidies for particular local units.

5. Act 374 does not reduce the state-financed proportion of necessary costs of trial court operations to the units at issue from that provided on a statewide basis in 1978.

6. The coemployment relationship between local funding units and the courts created by Act 374 violates the Separation of Pow-

ers Clause, Const 1963, art 3, § 2. The part of the order in Docket No. 201852 finding that provisions of Act 374 creating a coemployer relationship between the county and the court violate the Separation of Powers Clause must be affirmed.

7. The judiciary possesses as inherent power all the authority necessary to exercise its powers as a coordinate branch of government. The circuit court possesses the inherent and exclusive power to manage all its operations.

8. Section 593a of Act 374 allows too much interference with the judiciary's inherent authority to manage its internal operations. Although the grant of authority to the legislative branch may be specific, it is certainly not limited.

9. Subsection 593a(3) is an outright takeover of the court's employees, making them employees of the county. Subsection 593a(3) violates the Separation of Powers Clause.

10. Subsection 593a(4) of Act 374, which grants equal authority to the county and the court in establishing all personnel policies and procedures, violates the Separation of Powers Clause. The court's inherent administrative powers include the authority to manage all personnel matters affecting employees working within its branch. The power-sharing relationship is too much of an intrusion into the internal operations of the court and is inconsistent with the Separation of Powers Clause.

11. Subsection 593a(5) is inconsistent with the Separation of Powers Clause because it divides the inherent managerial powers of the judiciary between the court and the county. It creates too great of an intrusion into the internal operations of the court by giving the county ultimate authority concerning all economic issues relating to the employees working within the court. The court has the inherent authority to determine the salaries of its personnel as long as it does not exceed its total budget appropriation.

12. Subsections 593a(3) to (5) of Act 374 must be stricken as unconstitutional.

13. Subsections 593a(7) and (9) are not affected by the stricken subsections 593a(3), (4), and (5) and can be read and enforced independently of the stricken provisions.

14. Subsections 593a(6) and (8) must be stricken because they expressly depend on the unconstitutional relationship created in subsections 593a(4) and (5).

15. The clear intent of subsections 593a(10), (11), (12), and (13) of Act 374 can still be effectuated by merely deleting references to subsection 593a(3) in those subsections rather than striking the entire subsections.

16. The stricken provisions of § 593a are severable from Act 374 and there is no need to strike down the entire act.

17. No set of circumstances exists under which the stricken provisions of Act 374 would be valid.

18. The separation of powers issues involved here are ripe for review.

19. Although cooperation between the branches of government is essential to the process of determining a reasonable appropriation for the expenses of the judiciary, the amount appropriated must be determined by good-faith negotiation between the judiciary and the legislative branch. The "experimental" legislation under consideration here creates an imbalance in the bargaining positions of the judiciary and the legislative branch that makes good-faith negotiations more difficult.

20. The issues relating to the PERA are rendered moot by the striking of the unconstitutional provisions of Act 374.

Affirmed in part and reversed in part.

MARKMAN, P.J., dissenting from the majority's conclusion that a number of the provisions of 1996 PA 374 must be stricken from the act as violative of the Separation of Powers Clause, Const 1963, art 3, § 2, stated that any potential separation of powers concerns are not yet ripe for decision.

1. Although the provisions struck down by the majority may allow the possibility of overreaching by the legislative branch, it has not been demonstrated that no set of circumstances exists under which Act 374 would be constitutionally valid, a requirement for a facial challenge to the constitutionality of a statute. That a constitutional violation conceivably might occur is not equivalent to finding that a violation must necessarily occur.

2. The constitutional separation of powers does not prohibit the exercise of distinct powers by separate branches jointly in pursuit of a common end; rather, it only forbids one branch from exercising the powers of another branch. The separated powers of the branches do not overlap; however, the exercise of these powers often does. The branches are not entitled to operate with absolute independence in those subject-matter areas in which other branches also possess a legitimate interest. Although the majority correctly finds the judicial branch has ancillary inherent powers, the majority assumes without authority that inherent powers are necessarily exclusive, despite the fact that such powers will generally relate to governmental matters over which another branch may also possess power. The branches are entitled to exercise only their own powers with independence, not the powers of other branches. Both the local funding unit and the trial court have legiti-

mate responsibilities relating to the operation of the trial courts that derive directly from the constitution and the laws.

3. The constitutional separation of powers does not inhibit experimentation and innovation in addressing subject matters regarding which different branches possess intersecting responsibilities. It only requires that whatever relationship is devised does not impinge on the constitutional function of any branch by allowing another branch to exercise its powers.

4. The designation in subsection 593a(3) of Wayne County as the "employer," on its face, does not impinge on the judiciary by enabling the legislative branch to usurp the judicial function. Whether, in practice, a local unit will impinge on the judiciary's constitutional functions by virtue of this provision is not currently ripe for adjudication.

5. Questions concerning the constitutionality of subsections 593a(4) and (5) are not ripe for adjudication.

6. But for the adoption of the provisions of § 593a that the majority strikes down, it is not at all certain that the remainder of Act 374 would have been adopted in its present form or at all. The majority has not adequately addressed the severability issue.

7. Section 593a is not inconsistent with the PERA.

8. The order in Docket No. 201850 and the part of the order in Docket No. 201852 determining that Act 374 violates the Headlee Amendment should be reversed. The part of the order in Docket No. 201852 finding that Act 374 violates the Separation of Powers Clause should be reversed and the part of the order finding that Act 374 does not violate the PERA should be affirmed.

1. CONSTITUTIONAL LAW — HEADLEE AMENDMENT.

The Headlee Amendment guarantees the state will not reduce its proportion of the necessary costs of existing activities or services and that the state will pay entirely for necessary costs when it mandates new activities or services or to the extent the state increases the level of an existing activity or service; increased levels of local spending attributable to other causes are not addressed by the amendment (Const 1963, art 9, § 29).

2. CONSTITUTIONAL LAW — HEADLEE AMENDMENT.

The formulation to make the necessary comparison between state aid provided during the Headlee Amendment base year (1978) and a later year in which funding is challenged involves comparing the ratio of total state aid for a required activity to total necessary costs for the required activity in 1978 with the ratio of state aid to an individual local unit of government for the activity to the necessary costs of that unit for the activity in the year of challenged

funding; under this formulation, the state is obligated to afford each unit providing the activity or service the same proportion of funding that the state provided on a statewide basis in 1978 (Const 1963, art 9, § 29).

3. CONSTITUTIONAL LAW — HEADLEE AMENDMENT — TRIAL COURT FUNDING — 1996 PA 374.

State law in 1978 mandated that local units of government fund the trial courts; the local units financed and operated the circuit and district courts and the state subsidized a portion of judicial salaries in 1978; 1996 PA 374 does not mandate new activities for local units vis-à-vis the state in comparison with 1978 and does not increase the level of any activity required of local units, although particular local units may be required by Act 374 to finance activities previously financed by other local units; where Act 374 does not reduce the state-financed proportion of necessary costs of trial court operations to local units no Headlee Amendment violation occurs (Const 1963, art 9, § 29).

4. CONSTITUTIONAL LAW — SEPARATION OF POWERS — 1996 PA 374.

The provisions of § 593a of 1996 PA 374 creating a coemployment relationship between local funding units and the courts and providing for the sharing of authority over court employees violates the Separation of Powers Clause; subsections 593a(3), (4), (5), (6), and (8) violate the Separation of Powers Clause and must be stricken; subsections 593a(7) and (9) do not violate the constitution and need not be stricken; the intent of subsections 593a(10), (11), (12), and (13) can still be effectuated by merely deleting the references to subsection 593a(3) in those provisions without striking the rest of those subsections; the stricken provisions of § 593a are severable from Act 374 and the entire act need not be struck down (Const 1963, art 3, § 2).

5. CONSTITUTIONAL LAW — SEPARATION OF POWERS — JUDICIAL POWERS.

The judiciary, in addition to its traditional adjudicative powers, possesses all the authority necessary to exercise its inherent powers as a coordinate branch of government; a circuit court has the inherent and exclusive power to manage all its operations; a court's inherent administrative powers include the authority to manage all personnel matters affecting employees working within its branch of the government.

City of Detroit Law Department (by *Phyllis A. James*, Corporation Counsel, *Joanne D. Stafford*, Chief Assistant Corporation Counsel, and *Dennis A.*

*Mazurek*, Principal Assistant Corporation Counsel), and *Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Peter H. Ellsworth, Joseph C. Marshall, III*, and *Jeffery V. Stuckey*), for the mayor of the city of Detroit and the City of Detroit.

*Gregory, Moore, Jeakle, Heinen, Ellison & Brooks, P.C.* (by *Mark L. Heinen*), for the Government Administrators Association.

*Lee R. Franklin*, for the Judicial Attorneys Association.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Deborah A. Devine, Margaret Bartindale, Gary P. Gordon*, and *Thomas C. Nelson*, Assistant Attorneys General, for the state of Michigan, the Department of Management and Budget, the Governor of the state of Michigan, and the Attorney General.

*Jennifer M. Granholm*, Corporation Counsel, *William S. Noakes*, Deputy Corporation Counsel, and *John C. Burchett* and *Harnetha W. Jarrett*, for Wayne County and Wayne County Board of Commissioners.

Before: MARKMAN, P.J., and MCDONALD and FITZGERALD, JJ.

MCDONALD, J. These cases present three challenges to 1996 PA 374.[1] Plaintiffs first contend that Act 374

---

[1] Significant features of Act 374 for the purposes of these appeals are that it abolishes the Detroit Recorder's Court and merges it with the Wayne Circuit Court (Third Circuit Court); that it mandates local unit funding for the district and circuit courts, including the newly merged Third Circuit Court and the 36th District Court; and that it outlines a relationship between local funding units and the courts with respect to employees serving in the court. According to its preamble, Act 374 is

violates Const 1963, art 9, §§ 25 and 29 (the Headlee Amendments).[2] Plaintiffs next contend that Act 374 violates Const 1963, art 3, § 2 (the Separation of Powers Clause). Finally, plaintiffs contend that Act 374 violates the public employment relations act (PERA), MCL 423.201 *et seq.*; MSA 17.455(1) *et seq.* The circuit court held that Act 374 violated both the Headlee Amendment and the Separation of Powers Clause, Const 1963, art 3, § 2, but that it did not violate the PERA. We affirm in part and reverse in part.[3]

Docket No. 201850 presents the city of Detroit's challenge to the requirement of Act 374 that the city fully fund the 36th District Court. Plaintiffs, the mayor of Detroit and the city of Detroit, commenced this action for a declaratory ruling that the provisions of Act 374 pertaining to the transfer of funding responsibility for the 36th District Court to the city of Detroit violate the Headlee Amendment, Const 1963, art 9, § 29, and the notice requirements contained in MCL 21.238(2); MSA 5.3194(608)(2) and MCL 21.235(2); MSA 5.3194(605)(2)[4] because the Legisla-

---

designed to revise the organization and jurisdiction of the courts. House Legislative Analysis, HB 5158, July 29, 1996, states that Act 374 is inter alia a response to "perceived inequity of the state funding of trial courts" and an effort at "standardizing the state court system."

[2] Section 29 specifically effects a provision set forth generally in § 25.

[3] We are aware that other challenges have been raised regarding Act 374, including those relating to the federal Voting Rights Act and the constitutionality of the procedures by which Wayne Circuit Court judges are designated. We do not address these issues, but only those appealed in the instant matter.

[4] Of course, if 1996 PA 374 is inconsistent with this or any previously enacted statute, then Act 374 is not, on that account alone, invalid. Rather, Act 374 would effect a repeal of such other statute by implication. *Washtenaw Co Rd Comm'rs v Public Service Comm*, 349 Mich 663, 680; 85 NW2d 134 (1957); *Antrim Co Social Welfare Bd v Lapeer Co Social Welfare Bd*, 332 Mich 224, 228; 50 NW2d 769 (1952). This notion is a corollary to the principle that one Legislature cannot enact irrepealable

ture did not make an appropriation sufficient to pay for the increase in an activity or service required of the city. The circuit court granted plaintiffs' motion for summary disposition. Defendants, state of Michigan and the Department of Management and Budget (collectively the state), appeal as of right the trial court's grant of plaintiffs' motion for summary disposition.

Docket No. 201852 presents challenges by defendants/cross-plaintiffs Wayne County and the Wayne County Board of Commissioners and by plaintiffs the Judicial Attorneys Association (JAA) and Government Administrators Association (GAA) (the collective bargaining representatives of the employees of the Wayne Circuit Court and the Detroit Recorder's Court) to the dissolution of the Detroit Recorder's Court and its consequent merger with the Wayne Circuit Court (Third Circuit Court). The circuit court declared that the provisions of Act 374 pertaining to the Recorder's Court, including those making Wayne County the employer of employees working in the Recorder's Court and those transferring funding obligations to Wayne County, violate the Headlee Amendments, Const 1963, art 9, §§ 25 and 29. Defendants/cross-defendants state of Michigan, the Governor, and the Attorney General (collectively the state) appeal as of right an order granting summary disposition to cross-plaintiffs Wayne County and Wayne County Board of Commissioners (collectively Wayne County).

---

legislation or restrict its own power or that of its successors concerning the repeal or amendment of statutes. *Atlas v Wayne Co Bd of Auditors*, 281 Mich 596, 599; 275 NW 507 (1937). Accordingly, any contention based on another *statute* is rejected.

In Docket No. 201852, the circuit court also enjoined the state from enforcing Act 374 to the extent that it makes Wayne County a coemployer of JAA and GAA members, finding that a sharing of authority over employment matters by two branches of government violates the Separation of Powers Clause, Const 1963, art 3, § 2. The state appeals this order as of right. The JAA and the GAA also cross appeal as of right, challenging the court's determination that the coemployment provisions of Act 374 did not violate the PERA. The appeals were consolidated.

Regarding the two constitutional challenges, we are mindful that "under established rules of statutory construction, statutes are presumed constitutional, and courts have a duty to construe a statute as constitutional unless unconstitutionality is clearly apparent." *Mahaffey v Attorney General*, 222 Mich App 325, 344; 564 NW2d 104 (1997). To make a successful facial challenge to the constitutionality of a statute, as plaintiffs attempt here, the challenger must establish that " 'no set of circumstances exists under which the [a]ct would be valid.' " *Council of Organizations & Others for Ed About Parochiaid v Governor*, 455 Mich 557, 568, 602; 566 NW2d 208 (1997), quoting *United States v Salerno*, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987). "The constitutionality of a statute is a question of law that this Court reviews de novo." *Blank v Dep't of Corrections*, 222 Mich App 385, 392; 564 NW2d 130 (1997). Whether Act 374 violates the PERA, a question of statutory interpretation, is also a question of law that this Court reviews de novo. *In re Lafayette Towers*, 200 Mich App 269, 273; 503 NW2d 740 (1993).

I

We begin our analysis with the Headlee Amendment challenge. The principal Headlee Amendment provision at issue is Const 1963, art 9, § 29, which states:

> The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law. A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs. The provision of this section shall not apply to costs incurred pursuant to Article VI, Section 18.

The first sentence of this provision prohibits reduction of the state proportion of necessary costs with respect to the continuation of state-mandated activities or services. The second sentence requires the state to fund any additional necessary costs of newly mandated activities or services and increases in the level of such activities or services from the 1978 base year. This language does not guarantee that local units' spending levels will not increase from the 1978 level. Rather, the Headlee Amendment only guarantees that the state will not reduce its *proportion* of the necessary costs of existing activities or services, and that the state will pay entirely for necessary costs when it mandates new activities or services or to the extent the state increases the level of an existing activity or service. Increased levels of local spending attributable to other causes, e.g., inflation or the greater utilization of a program by the public, are not

addressed by this provision of the Headlee Amendment.

The Michigan Supreme Court has interpreted § 29 to " 'reflect an effort on the part of the voters to forestall any attempt by the Legislature to shift [fiscal] responsibilities to the local government . . . .' " *Schmidt v Dep't of Ed*, 441 Mich 236, 250; 490 NW2d 584 (1992), quoting *Durant v State Bd of Ed*, 424 Mich 364, 379; 381 NW2d 662 (1985). The two sentences of § 29 "must be read together '[b]ecause they were aimed at alleviation of two possible manifestations of the same voter concern . . . .' " *Schmidt, supra* at 251, quoting *Durant, supra* at 379. To make the necessary comparison between state aid provided during the Headlee Amendment base year (1978) and a later year at issue, the *Schmidt* Court considered, at length, three possible formulations: the "state-to-state" formulation, the "local-to-local" formulation, and the "state-to-local" formulation.[5] It ultimately adopted the "state-to-local" formulation.[6] This method

---

[5] These methods differ regarding whether total state aid or state aid to a particular local unit is used in comparing state aid for an activity in 1978 to state aid for the activity in the year at issue. Under the "state-to-state" method, the total state aid in 1978 is compared with the total state aid in the year at issue; under the "local-to-local" method, state aid to a particular unit in 1978 is compared with state aid to the particular local unit in the year at issue; and under the "state-to-local" method, total state aid in 1978 is compared with state aid to the particular unit in the year at issue. *Schmidt, supra* at 248-249. Chief Justice CAVANAGH apparently adopted the "state-to-state" approach in his dissent, *id.* at 264-283, while Justice LEVIN (with Justice RILEY concurring) apparently adopted the "local-to-local" approach in his dissent, *id.* at 284-314.

[6] The *Schmidt* Court's discussion of the two methods it rejected—the "state-to-state" and the "local-to-local" methods—are, because of the complexity of the analysis, sometimes inadvertently quoted out of context, leaving an erroneous impression regarding its holding. For example, in Docket No. 201852, the circuit court quoted from the *Schmidt* Court's rejection of the "state-to-state" method and erroneously concluded from this language that a funding shift from one local unit (the city of Detroit)

involves comparing "the ratio of total state aid for a required activity to total necessary costs for the required activity in the base year . . . with the ratio of state aid to an individual local unit of government for the activity to the necessary costs of that unit for the activity in the year of challenged funding." *Schmidt, supra* at 249. Under this formulation, "[t]he state is obligated to afford each unit providing the activity or service the same proportion of funding that the state provided on a statewide basis in the year that the Headlee Amendment was ratified." *Id.* at 250; see also *Durant v Michigan*, 456 Mich 175, 187; 566 NW2d 272 (1997).[7]

---

to another local unit (Wayne County) implicated the Headlee Amendment. The circuit court incorrectly, in our judgment, focused on whether the state was "making up," or compensating for, the loss of funding previously provided by the city of Detroit. This was not the correct test to determine whether there was a Headlee Amendment violation here. Rather, as stated above, the Headlee Amendment guarantees only that the state will not reduce its proportion of the necessary costs of existing activities from that provided on a statewide basis in 1978 and that the state will pay for increased necessary costs when it mandates new activities or increases the level of an existing activity. While there may be significant political implications in any decision by the Legislature to redirect funds from one local unit of government to another, we do not believe that such decisions are properly within the contemplation of the Headlee Amendment because they do not result in the state's attempting to circumvent its own spending constraints by shifting aggregate amounts of spending to other units of government. Section 29 of the Headlee Amendment was not designed generally to substitute for the political processes of government, by which there are sometimes factions, interests, or entities that can be characterized as "winners" or "losers," but merely to secure against one obvious means by which the state could avoid the fiscal limitations placed upon it by other provisions of the amendment.

[7] The Headlee Amendment thus is not averse to the idea that the state might choose to provide uniform amounts of assistance to local units, even though during the Headlee Amendment base year or a later year one or more local units might have received a greater proportion of assistance than other units. Consider, for example, a situation in which the state provided a special subsidy for a particular local unit in 1978 so that it received one hundred percent state financing (while all other units received fifty percent funding.) Under *Schmidt,* the local unit would *not*

In *Schmidt, supra* at 252, the Court discussed the voters' intent in ratifying the Headlee Amendment:

> The state-to-local formulation satisfies the voters' intent in enacting the Headlee Amendment. When the voters ratified the Headlee Amendment, they sought to ensure that when the state mandates a program, funds are provided to the local government to pay for that program. The state-to-local method of calculating the state's obligation achieves the voters' desire to secure a minimum level of funding for the local government unit for mandatory programs and to link the mandating of programs with the necessity for taxing to pay for those programs. This approach also creates the appropriate balance between the state's desire for discretion in allocating funds and the desire of the local units of government for minimum funding. The state-to-local ratio provides a uniform allocation of resources for mandatory programs. The state is free to supplement that minimum funding on the basis of its perception of need, but the local government is guaranteed its proportionate share.

To analyze the Headlee Amendment challenge, we must first determine what the relevant "activity or service" is here. The Legislature has defined these terms as follows:[8]

---

be guaranteed one hundred percent state financing by the Headlee Amendment, rather it would be guaranteed only the state funding proportion provided on a statewide basis in 1978 (i.e., an amount greater than fifty percent and less than one hundred percent depending upon the size of the local unit receiving the special subsidy). We do not agree with plaintiffs city of Detroit and Wayne County that the Headlee Amendment requires that a state preference, once extended to a local unit, be forever maintained.

[8] We are cognizant that such statutory definitions of constitutional language, although entitled to respectful consideration, are not binding unless and only to the extent that the legislative definitions are consistent with the result achieved by applying established principles of constitutional law to the same interpretive task. *Durant, supra,* 424 Mich 392. We conclude that these particular statutes are correct in their construction of the constitutional language at issue.

"Activity" means a specific and identifiable administrative action of a local unit of government. The provision of a benefit for, or the protection of, public employees of a local unit of government is not an administrative action. [MCL 21.232(1); MSA 5.3194(602)(1).]

"Service" means a specific and identifiable program of a local unit of government which is available to the general public or is provided for the citizens of the local unit of government. The provision of a benefit for, or the protection of, public employees of a local unit of government is not a program. [MCL 21.234(1); MSA 5.3194(604)(1).]

If an "activity or service" is defined too narrowly, any minute programmatic change might appear to be a "new" activity or service requiring state appropriation of the entire cost.[9] However, if an "activity or service" is defined too broadly, even a substantial shift in burden from the state to local units might appear to be merely the continuation of an existing activity or service.[10]

Const 1963, art 6, § 1 states:

The judicial power of the state is vested exclusively in one court of justice which shall be divided into one supreme court, one court of appeals, one trial court of general jurisdiction known as the circuit court, one probate court, and courts of limited jurisdiction that the legislature

---

[9] For example, during oral argument, one counsel for plaintiffs suggested that a state law provision substituting an obligation that local units maintain photocopies of some recordkeeping matter for a previous obligation that it maintain carbon copies, might well require Headlee Amendment compensation as a "new" activity.

[10] For example, joining together, for purposes of Headlee Amendment analysis, state assistance to local units for court services, police services, and jail services as part of the "law enforcement" function would appear to undermine the Headlee Amendment by defining "activity or service" in an excessively broad manner.

may establish by a two-thirds vote of the members elected
to and serving in each house.

This provision suggests that the "one court of jus-
tice" is the basic, organic unit of the judicial branch
of state government; therefore, the operation of this
unit would appear to be the appropriate "activity or
service" (hereinafter activity) for purposes of Headlee
Amendment analysis.[11] However, only the trial-level
courts are subject to local funding as discussed
below. Because the Headlee Amendment focuses on
state-mandated activities requiring local funding, only
the trial-level courts of the "one court of justice" raise
potential § 29 violations. To include the entire "one
court of justice" as the relevant activity would be
over-inclusive because the Court of Appeals and the
Supreme Court, unlike the trial-level courts, are not
locally funded. Further, such a broad description of
the relevant activity would permit the state to man-
date that local units begin funding the appellate-level
courts without it appearing to be a "new" activity
because the local units funded other portions of the
"one court of justice" in 1978—an illogical result.
Accordingly, we believe that the best accommodation
of the "one court of justice" provision of the constitu-
tion and the Headlee Amendment is to describe the
relevant activity as the operation of trial courts.

---

[11] This constitutional provision dictating that the various courts be
viewed as "one court of justice" distinguishes the operation of the court
system from, for example, operation of the educational system. See
*Durant, supra,* 424 Mich 388, which concludes that education, as a whole,
is not an "activity or service" for Headlee Amendment purposes. We con-
sider this constitutional provision only to determine the *scope* of the rele-
vant activity here, not to determine what the existing "state law" is for
purposes of the Headlee Amendment.

A comparison of the operation of trial courts under Act 374 and as mandated in 1978 (the Headlee Amendment base year) is necessary to determine whether Act 374 mandates new activities, increases existing activities, or merely continues existing activities. "[T]he term 'state law,' as used in Const 1963, art 9, § 29, means state statutes and state agency rules." *Durant, supra,* 424 Mich 387. Act 374, § 9931 abolishes the Recorder's Court[12] and merges it with the Third Circuit Court effective October 1, 1997. Act 374, § 591 requires the county board of commissioners in each county to annually appropriate funds for the operation of the circuit court in that county. Act 374, § 555 requires the state to pay the salary of circuit judges and to reimburse the county if it pays an additional salary within prescribed limitations. Act 374, § 8271 requires the governing body of each district funding unit to annually appropriate funds for the operation of the district court in that district. Act 374, § 8104 also requires district funding units to finance and operate the district courts. Act 374, § 8202 requires the state to pay the salary of district judges and to reimburse the local unit if it pays an additional salary within prescribed limitations. Accordingly, under Act 374, the state mandates that counties pay for the operation of the circuit courts, that district units pay for the operation of the district courts, and that the state pay circuit court and district court judicial salaries.

---

[12] The Recorder's Court is a court unique to Detroit. It is "a court of limited jurisdiction and has jurisdiction for the prosecution of crimes committed within the City of Detroit only." *People v Young (On Remand),* 220 Mich App 420, 433; 559 NW2d 670 (1996). In every other county in Michigan, crimes committed within a city are prosecuted in the circuit court.

A Headlee Amendment analysis next requires that we compare this with the operation of trial courts in 1978—the Headlee Amendment base year. In *Grand Traverse Co v Michigan*, 450 Mich 457, 473-474; 538 NW2d 1 (1995),  the Michigan Supreme Court stated:

> Despite the fact that the courts have always been regarded as part of state government, they have operated historically on local funds and resources. An unbroken line of cases stretching back 130 years recognizes the practice of imposing the costs of operating the courts on local funding units.

It stated, "[t]he widespread acceptance of the principle of funding most trial court expenses through local funding units has continued until today." *Id.* at 476. See also *Wayne Circuit Judges v Wayne Co*, 15 Mich App 713, 722, n 10; 167 NW2d 337 (1969), rev'd 383 Mich 10, 24; 172 NW2d 436 (1969)  ("the county is the proper arm of state government upon which the necessary expense of operating the circuit court devolves"), opinion of the Court superseded and the opinion by DETHMERS and BLACK adopted as the opinion of the Court on rehearing, and the opinion of the Court of Appeals affirmed 386 Mich 1; 190 NW2d 228 (1971).  In *Frederick v Presque Isle Co Circuit Judge*, 439 Mich 1, 6; 476 NW2d 142 (1991),  the Court stated:

> Traditionally, the county has been the primary unit in directing Michigan's criminal justice system.
>
> "[J]udicial circuits are drawn along county lines and counties are required by statute to bear the expenses of certain courtroom facilities ([MCL 600.551] MSA 27A.551), [repealed] circuit court commissioner salaries ([MCL 600.1067] MSA 27A.1067),  stenographer's salaries ([MCL

600.1114] MSA 27A.1114), juror's compensation ([MCL 600.1231] MSA 27A.1231), and fees for attorneys appointed by the court to defend persons who cannot procure counsel for themselves ([MCL 775.16] MSA 28.1253)." [OAG, 1967-1968, No 4,588, pp 49, 50 (June 12, 1967).]

See also the versions of the following statutes applicable in 1978: MCL 600.555; MSA 27A.555 (allowing counties to pay circuit judges an additional salary), and MCL 600.1471; MSA 27A.1471 (mandating that judges fix the compensation of law clerks within the sum appropriated by the local funding unit). Regarding the district courts, the version of MCL 600.8104; MSA 27A.8104 applicable in 1978 required district units to finance and operate the district courts. In *Employees & Judge of the Second Judicial Dist Court v Hillsdale Co*, 423 Mich 705, 713; 378 NW2d 744 (1985), the Court stated that MCL 600.9947; MSA 27A.9947, added by 1980 PA 438, was an attempt by the state to eliminate local funding of state judicial functions. *Second Dist Court* thus clearly recognizes that, before that 1980 act, the state effectively mandated local funding of trial court operations.

Before Act 374 there was no particular statute that explicitly stated that local units were responsible for funding trial courts. Rather, as set forth above, a number of statutes addressing particular aspects of trial court operations clearly implied that local units were to fund trial courts. The mosaic of these various statutes, and the strong tradition of local funding of trial courts recognized in case law, demonstrates that state law effectively mandated that local units fund

trial courts in 1978.[13] Accordingly, we conclude that in 1978 state law mandated that local units fund trial courts. If one were to ignore the clear implication of these statutes, the only alternative would be to conclude that "state law" did not mandate local funding of trial courts in 1978; as a result, the entire operation of the trial courts would be a "new" activity for which the state must now provide one hundred percent financing. None of the parties suggested this to be the case and we do not believe it to be so.

The state contends that complete financial records from the pre-Headlee Amendment period are not available; however, it is apparently undisputed that the state's only contribution to trial court operations in 1978 was with respect to a portion of judicial salaries. Accordingly, in 1978 local units financed and operated the circuit and district courts and the state subsidized a portion of judicial salaries.

During oral argument, the state analogized the operation of trial courts to a pie and described the comparison of trial court operations in 1978 to that mandated under Act 374 as adjustments among the local units in the slices for which they are responsible, with the state taking a bigger piece of the pie. This analogy, in our judgment, accurately describes the comparison. Nothing in Act 374 mandates new activities for local units vis-à-vis the state in comparison with 1978. Nor does Act 374 increase the level of any activity required of local units. Particular local units, however, may be financing activities previously financed by other local units (e.g., Wayne County's

---

[13] We note that in determining "state law," the *Durant* Court considered the well-established tradition of local control over school operation. *Durant*, 424 Mich 385, n 14.

being required to finance the Recorder's Court, formerly financed in part by the city of Detroit). Also, particular local units may be financing activities that, *after 1978*, were financed by the state. The Headlee Amendment does not directly address state mandates that result in shifts among local units or reductions in post-1978 state subsidies for particular local units; it only guarantees that each local unit will receive the same proportion of state funding provided on a statewide basis in the base year of 1978.[14] Act 374 accordingly continues existing activities, as opposed to mandating new activities or increasing the level of existing activities. Therefore, the only remaining issue is whether Act 374 reduces the state-financed pro-

---

[14] Although not dispositive, we note that the Headlee Amendment was designated to be incorporated exclusively in art IX of the 1963 constitution. Art IX is entitled "Finance and Taxation." However, art VII, "Local Government," is the article that limits legislative authority to regulate, command, or otherwise intrude into the municipal affairs of counties, cities, villages, and metropolitan governments and authorities. If the Headlee Amendments were intended to directly and explicitly delimit the power of the Legislature over municipal affairs, then the Secretary of State was obligated to apprise voters that parts of art VII might be "altered or abrogated." Const 1963, art 12, § 2; *Ferency v Secretary of State*, 409 Mich 569, 592-595; 297 NW2d 544 (1980). To date, the Headlee Amendment has only been construed as erecting a financial barrier against legislative creation of new municipal obligations in terms of activities or services and against the legislature's shifting the financial responsibility for existing activities or services from the state to local government. Nothing in the Headlee Amendment addresses the entirely separate issue of transfers of financial responsibility between or among local governments, as long as the state's pro-rata share of such costs to each local unit is not thereby reduced or diminished. Further, when a Headlee Amendment violation occurs, the remedy is not judicial abrogation of the statute; rather, the matter properly returns to the Legislature, which must decide whether to finance the mandate with state funding or instead to forgo the mandate. *Durant, supra*, 456 Mich 203-206 (holding that the usual remedy for a Headlee Amendment violation will be declaratory relief, after which the Legislature must either abolish the mandate, fund the activity in accordance with the Headlee Amendment's dictates, or create a state liability for continued underfunding).

portion of the necessary costs of trial court opera-
tions to the units at issue from that provided on a
statewide basis in 1978. In 1978, the state's only con-
tribution to trial court operations was financing a por-
tion of judicial salaries. Thus, the state-financed pro-
portion in 1978 may be expressed as:

$$\text{SFP1} = \frac{\textit{dollar amount of state portion of judicial salaries on a statewide basis}}{\text{total necessary costs of trial court operations on a statewide basis}}$$

The state-financed proportion under Act 374 may be
expressed as:

$$\text{SFP2} = \frac{\textit{dollar amount of one hundred percent of judicial salaries in the unit at issue}[15]}{\text{total necessary costs of trial court operations in the unit at issue}}$$

The remaining issue therefore becomes whether,
under Act 374, the state is still providing at least that
same proportion of the total necessary costs of trial
court operations to the units at issue as it provided
on a statewide basis in 1978—that is, whether SFP2
with regard to the local units at issue, Wayne County
and the city of Detroit, is at least equal to SFP1. The
parties have not provided the numbers needed to pre-
cisely calculate SFP1 or, with respect to these two
units, SFP2. However, they have provided information
regarding the numerators of SFP1 and SFP2. Regarding
judicial salaries, the one item of trial court operations
to which the state contributed in 1978, Act 374
requires the state to finance one hundred percent of
judicial salaries to all local units, whereas the state
financed only some "portion" of those salaries in
1978. Thus, the state has clearly increased its funding
proportion of the only item of trial court operations

---

[15] For purposes of this discussion, we will not consider the funds pro-
vided by the Court Equity Fund and the Hold Harmless Fund. Even with-
out consideration of these funds, we are convinced that SFP2 is at least
equal to SFP1 with respect to the local units at issue.

to which it contributes. If we assume a relatively stable relationship between judicial salaries and the total necessary costs of trial court operations, SPF 2 must be at least equal to SPF1 because the state has increased its proportionate contribution to judicial salaries by Act 374.[16] Accordingly, we conclude that Act 374 does not reduce the state-financed proportion of necessary costs of trial court operations to either of the units at issue from that provided on a statewide basis in 1978. For these reasons, we find no Headlee Amendment violation in Act 374.[17]

II

Next, we address the separation of powers issue. The state argues the trial court erred in determining

---

[16] We recognize that if judicial salaries constituted a large proportion of the necessary costs of overall trial court operation expenses in 1978 and presently constituted only a small proportion of those necessary costs, the state could conceivably be reducing its proportion of the necessary costs of trial court operations despite the fact that it has increased its contribution to judicial salaries. However, we have no reason to believe this to be the case; and plaintiffs, who have the burden of proof with regard to this issue, have failed to provide evidence demonstrating such a situation. Specifically, we are unaware of any dramatic structural change in the ratio of support personnel or infrastructure costs for each judge during this period that might result in a decrease in the state proportion of "necessary" trial court expenses despite the increase in the state's contribution to judicial salaries.

[17] We recognize that the financial burdens on the city of Detroit and Wayne County for trial court operations are substantially heavier than they were in the Headlee Amendment base year of 1978 or in 1982 when the state undertook to subsidize a greater portion of the funding for local courts in Detroit and Wayne County. However, the same is true for all local units across the state. Again, as already noted, with respect to continuing activities, as long as any increased burden on a local unit is not a function of the state's reducing its *proportion* of funding from that provided on a statewide basis in 1978, the Headlee Amendment is not implicated. Plaintiffs are afforded no greater insulation than any other local unit from the rising costs of providing public services merely because the state undertook to provide them with funding subsidies for a period during which costs were generally rising for everyone.

that the coemployment relationship between local funding units and the courts created by Act 374 violates the Separation of Powers Clause, Const 1963, art 3, § 2. The trial court found that the provisions of Act 374, § 593a for the sharing of authority over court employees violate the Separation of Powers Clause because this relationship "disrupts the delicate balance between the judiciary's right to control its employees and the county's responsibility to fund the court" and "creates the potential for overreaching by the County."[18] We agree with the trial court's conclusion that the relationship violates the Separation of Powers Clause.[19]

Const 1963, art 3, § 2 provides:

> The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.

This separation of powers among the three branches of government is designed to preserve the indepen-

---

[18] The trial court relied in large part on *Berrien Co Probate Judges v Michigan AFSCME Council 25, AFL-CIO*, 217 Mich App 205; 550 NW2d 859 (1996); however, the Michigan Supreme Court subsequently ordered that this opinion shall "have no precedential force or effect." 454 Mich 906 (1997).

[19] We note that below plaintiffs JAA and GAA also challenged the constitutionality of Act 374, § 591(1), which provides that a local funding unit shall annually appropriate funds for operation of its circuit court "by line-item or lump-sum budget." This issue has not been raised on appeal. However, we note that the validity of this provision is questionable in light of decisions holding that the Separation of Powers Clause prohibits the use of line-item appropriations by the legislative branch for operation of the courts. See *Ottawa Co Controller v Ottawa Probate Judge*, 156 Mich App 594, 604-606; 401 NW2d 869 (1986); *Judges of the 74th Judicial Dist v Bay Co*, 385 Mich 710, 726-727; 190 NW2d 219 (1971).

dence of each branch. *In re 1976 PA 267*, 400 Mich 660, 662; 255 NW2d 635 (1977).

In *Second Dist Court, supra* at 717, the Michigan Supreme Court explained:

> Each branch of government has inherent power to preserve its constitutional authority.
>
> "It was certainly never intended that any one department, through the exercise of its acknowledged powers, should be able to prevent another department from fulfilling its responsibilities to the people under the Constitution." [*O'Coin's, Inc v Worcester Co Treasurer*, 362 Mass 507, 511; 287 NE2d 608 (1972).]
>
> However, an indispensable ingredient of the concept of coequal branches of government is that "each branch must recognize and respect the limits on its own authority and the boundaries of the authority delegated to the other branches." *United States v Will*, 449 US 200, 228; 101 S Ct 471; 66 L Ed 2d 392 (1980).

The doctrine of separation of powers "has never been interpreted in Michigan as meaning there can never be any overlapping of functions between branches or no control by one branch over the acts of another." *People v Trinity*, 189 Mich App 19, 22-23; 471 NW2d 626 (1991), citing *Soap & Detergent Ass'n v Natural Resources Comm*, 415 Mich 728, 752; 330 NW2d 346 (1982). Instead, Michigan has adopted the view of the separation of powers doctrine that James Madison expressed in The Federalist No. 47: " '[W]here the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution are subverted.' " *Soap & Detergent Ass'n, supra* at 752 (emphasis in original). Accordingly, some overlap of the three branches of government is permitted, but only where the area of one

branch's exercise of another branch's power is very limited and specific. *Trinity, supra* at 23.

At issue in this case is the relationship between the legislative branch (the county) and the judicial branch (the trial court). In order to determine whether the challenged provisions of Act 374 violate the Separation of Powers Clause by allowing the legislative branch to invade the powers of the judiciary, it is necessary to examine the powers of the judicial branch. The judicial power of the state is vested exclusively in "one court of justice . . . ." Const 1963, art 6, § 1. Included within the judicial power is the authority to determine what the law is and apply it to decide the rights of parties. *Johnson v Kramer Bros Freight Lines, Inc*, 357 Mich 254, 257; 98 NW2d 586 (1959). In addition to such traditional adjudicative powers, the Michigan Supreme Court has long recognized that the judiciary possesses "all the authority necessary to exercise its powers as a coordinate branch of government." *In re 1976 PA 267, supra* at 663; *Gray v Clerk of Common Pleas Court*, 366 Mich 588, 595; 115 NW2d 411 (1962). This inherent power of the judiciary has been recognized as essential to preserving the independence of the judicial branch. *Wayne Circuit Judges, supra*, 386 Mich 9-10; *Gray, supra* at 595. In her dissent in *Second Dist Court, supra* at 734, Justice RILEY described the inherent power of the judiciary as authority that "does not deal with judicial matters [but instead] relates to the administration of the business of the court." In *In re 1976 PA 267*, supra at 663, the Court included administrative powers when describing the nature of the judicial powers, stating:

> The judicial powers derived from the Constitution include rulemaking, supervisory and other administrative powers as

well as traditional adjudicative ones. They have been exclusively entrusted to the judiciary by the Constitution and may not be diminished, exercised by, nor interfered with by the other branches of government without constitutional authorization.

Administrative powers are managerial in nature. In order to carry out its stated adjudicative powers, the judiciary, and likewise the legislative and executive branches, must have the inherent authority to manage operations of its branch. An apt description of the need for this power is found in the superseded original opinion of the Court in *Wayne Circuit Judges*, *supra*, 383 Mich 20-21. There, the Court stated:

> It is the imperfection of human institutions which gives rise to our notion of inherent power. It is simply impossible for a judge to do nothing but judge; a legislator to do nothing but legislate; a governor to do nothing but execute the laws. The proper exercise of each of these three great powers of government necessarily includes some ancillary inherent capacity to do things which are normally done by the other departments.
>
> Thus, both the legislative department and the judicial department have certain housekeeping chores which are prerequisite to the exercise of legislative and judicial power. And, to accomplish these housekeeping chores both departments have inherently a measure of administrative authority not unlike that primarily and exclusively vested in the executive department.

Finally, we note that the Supreme Court's recent Administrative Order No. 1997-6, which commented on the separation of power implications of Act 374 and set forth guidelines for its implementation, is consistent with our recognition that the judiciary possesses such managerial powers:

The principle of separation of powers requires that the fundamental and ultimate responsibility for all aspects of trial court operations, including personnel matters, resides within the judicial branch. Practical principles of modern management similarly advise that the primary responsibility for trial court operations, including personnel matters, should reside at the local level, with the chief judge of the trial court. Effective management of the operation of a trial court, however, also requires a positive working relationship between chief judges and the local funding units of their courts in the exercise of shared responsibility to the public. In addition to protecting the managerial responsibilities of the judiciary over its branch of government, the principle of separation of powers protects local funding units in their own area of fundamental responsibility: the appropriation of public dollars. Given the separate responsibilities of the judiciary and the court's funding units, the application of the principle of separation of powers to the operation of trial courts requires a practical reconciliation of the separate constitutional spheres of the legislative and judicial branches where those spheres intersect.

For all these reasons, we hold that the circuit court, as a division of Michigan's "one court of justice," possesses the inherent and exclusive power to manage all its operations. Accordingly, in determining whether the provisions of Act 374 allow an impermissible intrusion into the powers of the judiciary by the legislative branch, we must consider the effect of its provisions on this inherent power of the court to administer its business.

In § 593a of Act 374, the Legislature envisioned that either the Wayne County Judicial Council, if timely created by the Wayne County Board of Commissioners, or Wayne County would be the "employer" of the employees at issue. See subsections

593a(2) and (3).[20] Because a judicial council was not created,[21] the term "employer" as used in § 593a refers by default to Wayne County. Subsection 593a(4) grants the "employer," i.e., Wayne County, certain authority that is to be exercised in concurrence with the chief judge, including, but not limited to, the ability to enter into collective bargaining agreements with the court employees' representatives. Subsection 593a(5) sets forth the division of authority in the event of an impasse between the chief judge and the county. The pertinent portions of the statute provide:

> (3) If the Wayne county judicial council is not created pursuant to subsection (1), the employees of the former state judicial council serving in the circuit court in the third judicial circuit or in the recorder's court of the city of Detroit shall become employees of the county of Wayne, effective October 1, 1996.
>
> (4) The employer designated under subsection (2) or (3) [Wayne County], in concurrence with the chief judge of the appropriate court, has the following authority:
>
> (a) To establish personnel policies and procedures, including, but not limited to, policies and procedures relating to compensation, fringe benefits, pensions, holidays, leave, work schedules, discipline, grievances, personnel records, probation, and hiring and termination practices.

---

[20] Section 593 of Act 374 achieves this same purpose. It provides:

Effective October 1, 1996, each employee of the former state judicial council serving in the circuit court in the third judicial circuit shall become an employee of the Wayne county judicial council if that council is created pursuant to section 593a, or, if that council is not created, shall become an employee of the county of Wayne.

[21] We express no opinion regarding the constitutionality of designating the Wayne County Judicial Council (if it had been timely created) as employer of the employees at issue.

(b) To make and enter into collective bargaining agreements with representatives of those employees.

(5) If the employer [Wayne County] and the appropriate chief judge are not able to concur on the exercise of their authority as to any matter described in subsection (4)(a), that authority shall be exercised by either the employer or the chief judge as follows:

(a) The employer has the authority to establish policies and procedures relating to compensation, fringe benefits, pensions, holidays, and leave.

(b) The chief judge has the authority to establish policies and procedures relating to work schedules, discipline, grievances, personnel records, probation, hiring and termination practices, and other personnel matters not included in subdivision (a). [MCL 600.593a(3), (4), and (5); MSA 27A.593a (3), (4), and (5).]

In our view, the statute creates a relationship between the legislative branch (the county) and the judicial branch (the court) that violates the Separation of Powers Clause. The statute simply allows too much interference with the judiciary's inherent authority to manage its internal operations. Although the grant of authority to the legislative branch may be specific, i.e. it concerns personnel matters, it is certainly not limited.

Subsection 593a(3) is an outright takeover of the court's employees, making them employees of the county. From a separation of powers standpoint, it is troubling that persons working solely within one branch be regarded as employees of another branch of government.[22] Employing and managing personnel

---

[22] We note that House Legislative Analysis, HB 5158, July 29, 1996, articulated concerns regarding this precise issue, stating:

Having the legislative branch of government provide employees for the judicial branch appears to violate the separation of powers

to carry out day-to-day operations is one of the most basic administrative functions of any branch of government. This Court has already suggested that, pursuant to the doctrine of separation of powers, one branch of government should not be subject to oversight by another branch in personnel matters. In *Beadling v Governor*, 106 Mich App 530, 536; 308 NW2d 269 (1981), this Court held that it would be a violation of the separation of powers doctrine "if the executive branch was allowed to judge the competency of a discharged employee of the legislative branch and order reinstatement." There, this Court observed that the employee at issue in *Beadling* held a position that "was one of some sensitivity within the legislative process" and that if executive oversight were allowed it would "allow a dangerous incursion. into the legislative realm." *Id.* Surely a usurpation of all the court's employees can be viewed as an equally dangerous incursion into the judicial realm. Accordingly, we view subsection 593a(3) as a violation of the Separation of Powers Clause.

We find subsection 593a(4) to be equally offensive to the doctrine of separation of powers. This provision grants equal authority to the county and the court in establishing *all* personnel policies and procedures. Thus, subsection 593a(4) goes beyond giving the county input concerning economic issues or collective bargaining agreements, issues that are argua-

---

established by the constitution. The legislative branch of state government doesn't provide the executive branch with its employees, nor does the executive branch provide the legislature with its employees. Why should this be so with the judiciary? Judicial accountability requires that the judiciary have control over its employees.

bly related to the county's exclusive power to appropriate public dollars for the operation of the trial court.[23] See Const 1963, art 4, §§ 1, 30-31. The Michigan Supreme Court and this Court have invoked the inherent power of the court in cases involving the judiciary's ability to determine who its employees are and to determine the salaries of its employees. *Gray, supra* at 595 (holding that "[t]o remove bailiffs and other court personnel for cause is an inherent power of the judiciary); *Judges of the 74th Judicial Dist v Bay Co*, 385 Mich 710, 727; 190 NW2d 219 (1971) (holding that its finding that the district courts rather than the local units have authority to set salaries was "wholly consonant" with the inherent judicial power doctrine); *Livingston Co v Livingston Circuit Judge*, 393 Mich 265; 225 NW2d 352 (1975) (extending the *Bay Co* holding to employees serving in the circuit and probate courts); *Ottawa Co Controller v Ottawa Probate Judge*, 156 Mich App 594, 603; 401 NW2d 869 (1986) (holding that the probate court has the inherent authority to set "reasonable salaries for its necessary employees in the first instance, as long as it remains within its total budget appropriation"). We now hold that the court's inherent administrative powers include the authority to manage all personnel matters affecting employees working within its branch. The effect of subsection 593a(4) is that the judicial branch is forced to share this inherent author-

---

[23] By recognizing that these issues may be related to the county's power to appropriate funds we do not mean to suggest that they are any more of an appropriate subject for legislative interference with the court's internal operations. We merely point out that subsection 593a(4) encompasses more than these economic issues because of the dissent's comment, *post* at 447, that finances are "the legitimate *legislative* concern of the local unit."

ity to manage its employees with the legislative branch. This power-sharing relationship is too much of an intrusion into the internal operations of the court and is inconsistent with the Separation of Powers Clause.

While subsection 593a(4) offends the constitution by allowing the county to share the court's inherent and exclusive authority over all personnel matters, subsection 593a(5) is inconsistent with the constitution because it divides the inherent managerial powers of the judiciary between the court and the county. This provision gives the county ultimate authority concerning all economic issues relating to the employees working within the court. Once again, we view this as too great of an intrusion into the internal operations of the court to be consistent with the Separation of Powers Clause. Amongst the powers designated to the county under this section is the power to "establish policies and procedures relating to compensation . . . ." MCL 600.593a(5)(a); MSA 27A.593a(5)(a). This Court and the Michigan Supreme Court have already ruled that as long as the court does not exceed its total budget appropriation, it has inherent authority to determine the salaries of its personnel. *Bay Co, supra* at 726-727; *Livingston Co, supra* at 272-273; *Ottawa Co, supra* at 603-604. We realize that at the time the Court decided *Bay Co* and *Livingston Co* there was express statutory authority for the circuit and district courts to set their employees' salaries. However, in *Bay Co, supra* at 727, the Court cited the doctrine of inherent powers of the courts as an independent basis for its decision. Moreover, in *Ottawa Co, supra* at 603-604, this Court decided that the probate court had the authority to

set the salaries despite the existence of statutes that, on their face, granted the authority to set the salaries of certain employees to the county. In light of this authority, we conclude that the provision of subsection 593a(5) granting the county ultimate control over salaries of court personnel is an unconstitutional delegation of the court's inherent power to the legislative branch. Moreover, economic issues are sensitive personnel matters that can greatly affect the functioning of the trial court. Not only does the level of compensation affect who is available to the court as an employee, but it also can affect the morale of the work force. Likewise, other economic matters such as fringe benefits, pensions, holidays, and leave are sensitive and important issues affecting court personnel. Allowing one branch to have control over these aspects of the internal operations of another branch cannot be characterized as a limited intrusion.

For all these reasons, we hold that subsections 593a(3)-(5) violate the Separation of Powers Clause and must be stricken.[24] When a statutory provision is found to be unconstitutional, a determination regarding its severability from the rest of the statute is required. The question is whether the invalidity of parts of an act require that the entire act be declared unconstitutional. *Pletz v Secretary of State*, 125 Mich App 335, 374; 336 NW2d 789 (1983). The statute governing severability, MCL 8.5; MSA 2.216, provides:

In the construction of the statutes of this state the following rules shall be observed, unless such construction would

---

[24] We note that § 593a is constructed similarly to provisions of Act 374 that are not at issue in the instant litigation, specifically §§ 591(4), 8271(6), and 8274(5).

be inconsistent with the manifest intent of the legislature, that is to say:

If any portion of an act or the application thereof to any person or circumstances shall be found to be invalid by a court, such invalidity shall not affect the remaining portions or applications of the act which can be given effect without the invalid portion or application, provided such remaining portions are not determined by the court to be inoperable, and to this end acts are declared to be severable.

In order "[t]o be capable of separate enforcement, the valid portion of the statute must be independent of the invalid sections, forming a complete act within itself." *Pletz, supra* at 375. The law enforced after an invalid portion of an act is severed must be "reasonable in view of the act as originally drafted." *Citizens for Logical Alternatives & Responsible Environment v Clare Co Bd of Comm'rs*, 211 Mich App 494, 498; 536 NW2d 286 (1995). One test to determine whether the law enforced is reasonable in light of the original act is "whether the law-making body would have passed the statute had it been aware that portions therein would be declared to be invalid, and, consequently, excised from the act." *Pletz, supra* at 375.

First we turn to the other provisions within § 593ato determine whether they may be read and enforced independently of the stricken provisions. Subsections 593a(7) and (9) are not affected by our striking of subsections 593a(3), (4), and (5) because these provisions, which address the chief judge's option not to participate in collective bargaining and the liability of the state, can be read and enforced independently of the stricken provisions. However, subsections 593a(6) and (8) expressly depend on the unconstitutional relationship created between the county and the court in subsections 593a(4) and (5).

Accordingly, these provisions must be stricken. Subsections 593a(10), (11), (12), and (13) refer to the appropriate employer designated under subsection (2) or (3). As we have already explained, the only provision relevant to our analysis is subsection 3 because the Wayne County Judicial Council provided for in subsection 2 was not timely created. We have ruled that the designation in subsection 3 of the county as the employer of persons working within the court is a violation of the Separation of Powers Clause. At first glance, these provisions may appear too dependent upon the stricken subsection 593a(3) to stand. However, the clear intent of these provisions is to provide a continuity of benefits to the employees who are no longer employed by the former State Judicial Council and to protect the rights of these employees vis-à-vis their new employer. This intent can still be effectuated by merely deleting references to subsection 3 in these provisions. The provisions would then ensure that the employees would not lose benefits acquired under their former employer, the State Judicial Council.

Next we turn to the remainder of Act 374. The act is comprehensive with numerous aims besides those addressed in the stricken portions of § 593a. See footnote 1, *supra*. We see no indication that the Legislature would not have adopted Act 374 had it known that this Court would excise portions of § 593a from the act. Accordingly, we find that the stricken provisions of § 593a are severable from Act 374 and see no reason to strike down the entire act. If the Legislature disagrees with our conclusion, it can repeal the remaining provisions of the act.

Our opinion would not be complete without discussing the position our colleague expresses in his dissent. First, we address our dissenting colleague's comments regarding our striking of the provisions at issue as facially unconstitutional. We agree a successful facial challenge to the constitutionality of a statute must establish that no set of circumstances exists under which the act would be valid. *Council of Organizations, supra* at 568. Although the dissent suggests there are several ways Act 374 could be implemented that would not run afoul of the constitution, he does not give any examples of such circumstances. In our view, no set of circumstances exists under which the act would be valid. On its face the act makes employees who were once employees of the court employees of the county, forces the judiciary to share its inherent power of managing its internal operations with the county, and then grants ultimate authority concerning all economic personnel issues to the county.[25] We cannot envision a way such an act could be implemented that would not invade the domain of the judiciary.[26]

---

[25] The dissent, *post* at 448, n 19, mischaracterizes our striking down several provisions of Act 374 as violative of the constitutional separation of powers *on the basis of a potential for overreaching* by the local funding unit. On the contrary, we hold the provisions represent overreaching by the local funding unit.

[26] The dissent cites the former State Judicial Council as an example of sharing of control over judicial employees by all three branches of government and wonders why these employees now challenge the similar arrangement under Act 374 as being a violation of the separation of powers provision of our constitution. The mere fact the arrangement was successful is no evidence it was constitutional. See *Blank, supra.* We suggest the lack of constitutional objections to the creation of the State Judicial Council was due to the state fully funding the operations of the participating courts, relieving local government of a sizable financial burden. 1980 PA 438; 1980 PA 440. When Act 374 shifted the financial burden back to local government, the present constitutional challenge was filed.

Our dissenting colleague also argues the issues before us are not ripe for review.[27] We note that the parties did not raise or argue the ripeness doctrine. We also note that if we were to refuse to decide this issue under the doctrine of ripeness, we believe we would be inviting litigation, resulting in a needless waste of judicial and legislative resources.[28] Moreo-

---

[27] It is interesting to note that although our dissenting colleague claims the issues are not ripe for our review, he nonetheless concludes subsection 593a(3) facially does not violate the constitutional separation of powers and there is nothing on the face of Act 374 or the particular provisions struck down by us that makes it certain, or even more likely than not, that any discrete judicial function of the trial court will be impaired.

[28] The dissent notes that neither the local units nor the trial courts have challenged the statute on separation of powers grounds. We take judicial notice that at least one funding unit has passed a resolution objecting to Administrative Order No. 1997-6.

WHEREAS, the Legislature of the State of Michigan adopted Act 374 of the Public Acts of 1996, an Act intended, in relevant part, to re-define and re-order the relationship between the trial courts of the State of Michigan and the local governmental units primarily responsible for funding those trial courts; and

WHEREAS, Act 374 had the effect of establishing local governmental unit "employer" status for non-judicial employees of the trial courts and line item budgeting authority, among other necessary and beneficial changes; and

WHEREAS, on August 18, 1997, the Honorable CONRAD L. MALLET, JR., Chief Justice of the Michigan Supreme Court, issued Administrative Order No. 1997-6, a copy of which is attached as Exhibit "A." Administrative Order No. 1997-6 postulated the unconstitutionality of Act 374, and arbitrarily and capriciously overturned the substance of the "employer status" reforms and the "line-item budgeting" reforms which constituted the heart of the reforms adopted in Act 374; and

WHEREAS, the implementation of Administrative Order No. 1997-6 will frustrate the efforts of the Michigan legislature and the local governmental units to bring order, accountability, and efficient administration to the trial court system;

NOW THEREFORE BE IT RESOLVED:

1) That the Tuscola County Board of Commissioners indicates its support for efforts to mediate and negotiate an end to the dispute occasioned by the issuance of Administrative Order No. 1997-6 with the goal of having that Order withdrawn in its entirety and

ver, in our view, these issues are ripe because the persons represented by plaintiffs JAA and GAA are presently in need of direction regarding the identity of their employer. Subsection 593a(4) divides the loyalty of former State Judicial Counsel employees between two masters and forces them to negotiate with two masters. We do not find such circumstances to be hypothetical or abstract questions that are not ripe for our review.

Finally, we comment regarding the implication throughout the dissent that our decision is somehow thwarting the intent of the Legislature to create a cooperative relationship between the county and the

---

having Act 374 of the Public Acts of 1996 given immediate and full effect; and

2) That the Tuscola County Board of Commissioners indicate [sic] its willingness to participate in these efforts, through its authorized representatives; and

3) That, simultaneous with such efforts, the Tuscola County Board of Commissioners supports the drafting and adoption of an amendment to the 1963 Constitution of the State of Michigan, which will implement the operative provision of Act 374, and thereby assure its implementation without interference by the Michigan Supreme Court; and

4) That simultaneous with such efforts, the Tuscola County Board of Commissioners will support and encourage other appropriate Constitutional and statutory changes which will assume [sic] the efficient, orderly, and cost effective administration of the trial courts, with a system of local control; and

5) That copies of this Resolution be sent to Senator Joel Gougeon, representative Michael Green, Governor Engler, the County of Ottawa, and the Michigan Association of Counties; and

BE IT FURTHER RESOLVED that all resolutions and parts of resolutions insofar as they conflict with this Resolution are hereby repealed.

I, Margie A. White, Tuscola Count [sic] Clerk, do hereby certify that the foregoing is a true and complete copy of a Resolution adopted by the Tuscola County Board of Commissioners at a regular meeting on January 13, 1998.

court.[29] We recognize that cooperation between the branches of government is essential to the process of determining a reasonable appropriation for the judiciary's expenditures. The amount appropriated must be determined by good-faith negotiation between the judiciary and the legislative branch. This process has worked very well on a federal and state level for over two hundred years, and its success is due to the fact that each branch has recognized and respected the limits on its own authority and the boundaries of the authority delegated to the other branches. Disagreement and impasse between the branches has been the exception rather than the rule. There is no doubt this harmony is due to each branch of government approaching the bargaining table on a level playing field as an equal. However, the "experimental" legislation under consideration creates an imbalance in the bargaining positions of the judiciary and the legislative branch, making good-faith negotiations more difficult. It is disingenuous to argue that one branch of government's taking over sole economic control of another branch's employees would improve their relationship and status as equal branches of government. To hold the stricken provisions of § 593a of Act 374 constitutional would seriously undermine the trial court's ability to carry out its judicial function and

---

[29] The dissent, *post* 451, n 22, suggests we partially rewrite certain provisions of § 593a and insert the words "the circuit court" anytime there is a reference to "employer." We believe any rewrite of legislation is within the province of the Legislature and not the judiciary. The dissent further claims our striking certain provisions of Act 374 renders all collective bargaining agreements hortatory unless the county independently decides to fund the agreement. What is new? Courts have been entering into collective bargaining agreements with their employees for years and both parties have known the agreement must be within the total appropriation allotted by the funding unit.

encourage the Legislature to take over the employees of the appellate branch of the judiciary and the executive branch under the guise of fiscal efficiency. Such legislation would destroy the judicial and executive branches of government's inherent power to preserve their constitutional authority. We expect no chaos will result from our decision because our holding merely reinstates the practice of this state since our first constitution.

### III

Finally, the JAA and the GAA contend that the trial court erred in finding that Act 374, § 593a did not violate the PERA. First the JAA and the GAA argue that the party designated by Act 374 as their employer, Wayne County, has no control over some of the mandatory subjects of bargaining. As concluded above, this provision is unconstitutional, and we have remedied this by providing that the employees at issue are employees of the court. Accordingly, this argument is now moot. The remaining PERA issues are also moot now that we have stricken the coemployer relationship created by subsections 593a(4) and (5) of Act 374.

For these reasons, in Docket No. 201850 we reverse the order determining that Act 374 violates the Headlee Amendment. In Docket No. 201852, we reverse the portion of the order determining that Act 374 violates the Headlee Amendment and affirm the determination that provisions of Act 374 creating a coemployer relationship between the county and the court violate the Separation of Powers Clause.

Affirmed in part and reversed in part.

FITZGERALD, J., concurred.

MARKMAN, P.J. (*concurring in part and dissenting in part*). I concur fully with the majority opinion's treatment of the Headlee Amendment issue. I write separately, however, because I disagree with the majority's conclusion that a number of provisions of 1996 PA 374 must be stricken from the act as violative of the constitutional separation of powers. Const 1963, art 3, § 2. In my judgment, any potential separation of powers concerns are not yet ripe for decision.

The Judicial Attorneys Association (JAA) and the Government Administrators Association (GAA) contend that the coemployment relationship between local funding units and the courts created by Act 374 violates the constitutional separation of powers. Const 1963, art 3, § 2. The trial court found that the provisions of Act 374 for the sharing of authority over court employees violates the constitutional separation of powers because it "creates the *potential* for overreaching by the County." (Emphasis supplied.)[1] Similarly, the majority strikes down several provisions of Act 374 as violative of the constitutional separation of powers on the basis of a *potential* for overreaching by the local funding unit.

However, "under established rules of statutory construction, statutes are presumed constitutional, and courts have a duty to construe a statute as constitutional unless unconstitutionality is clearly apparent." *Mahaffey v Attorney General,* 222 Mich App 325, 344; 564 NW2d 104 (1997). Here, the presumption of con-

---

[1] The trial court relied in large part on *Berrien Co Probate Judges v Michigan AFSCME Council 25, AFL-CIO,* 217 Mich App 205; 550 NW2d 859 (1996); however the Michigan Supreme Court subsequently ordered that this opinion shall "have no precedential force or effect." 454 Mich 906; 564 NW2d 46 (1997).

stitutionality is particularly strong because the Michigan Constitution specifically empowers the Legislature to "enact laws providing for the resolution of disputes concerning public employees, except those in the state classified civil service." Const 1963, art 4, § 48. To make a successful facial challenge to the constitutionality of a statute, as plaintiffs attempt here, the challenger must establish that " 'no set of circumstances exists under which the [a]ct would be valid.' " *Council of Organizations & Others for Ed About Parochiaid v Governor*, 455 Mich 557, 568, 602; 566 NW2d 208 (1997), quoting *United States v Salerno*, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987). Here, the specific provisions struck down by the majority may well allow the *possibility* of overreaching by the legislative branch, but there has been utterly no demonstration that "no set of circumstances exists" under which Act 374 would be valid under the constitutional architecture of Michigan. That it is *conceivable* that a constitutional violation might occur—indeed, even that it is more conceivable that it might occur than it was before the enactment of Act 374— is not equivalent to finding that a constitutional violation must necessarily occur.[2]

---

[2] If we had an actual case or controversy ripe for decision, there would be a concrete dispute between the county and the chief judge over a particular economic issue—presumably with the chief judge wishing to accede to some employee demand for a concession and the county balking at the expense. We would then be asked to decide whether the county's position was preventing the court from fulfilling its constitutional responsibilities. If we decided in the affirmative, we would rule that the chief judge could approve the concession notwithstanding the county's objections and that the county would have to fund the resulting agreement; if we decided in the negative, the chief judge could not agree to the demand without obtaining an equivalent savings elsewhere and then convincing the county to approve the package on a "bottom line" basis. See *Judges of the 74th Judicial Dist v Bay Co*, 385 Mich 710, 726-727; 190

Const 1963, art 3, § 2  states:

> The powers of government are divided into three
> branches: legislative, executive and judicial. No person
> exercising powers of one branch shall exercise powers
> properly belonging to another branch except as expressly
> provided in this constitution.

In *Employees & Judge of the Second Judicial Dist
Court v Hillsdale Co*, 423 Mich 705, 717; 378 NW2d
744 (1985),  the Michigan Supreme Court stated:

> Each branch of government has inherent power to pre-
> serve its constitutional authority.
>
> "It was certainly never intended that any one department,
> through the exercise of its acknowledged powers, should be
> able to prevent another department from fulfilling its
> responsibilities to the people under the Constitution."
> [*O'Coin's, Inc v Worcester Co Treasurer*, 362 Mass 507, 511;
> 287 NE2d 608 (1972).]
>
> However, an indispensable ingredient of the concept of
> coequal branches of government is that "each branch must
> recognize and respect the limits on its own authority and
> the boundaries of the authority delegated to the other
> branches." *United States v Will*, 449 US 200, 228; 101 S Ct
> 471; 66 L Ed 2d 392 (1980).

In *People v Trinity*, 189 Mich App 19, 22-23; 471
NW2d 626 (1991),  this Court held:

> The separation of powers doctrine has never been inter-
> preted in Michigan as meaning there can never be any over-
> lapping of functions between branches or no control by one
> branch over the acts of another. *Soap & Detergent Ass'n v*

---

NW2d 219 (1971). However, we have no such concrete dispute before us,
still less one in which the disputants are the county on the one hand and
the chief judge on the other, each contending that the other branch is
attempting to intrude on its own prerogatives.

*Natural Resources Comm,* 415 Mich 728, 752; 330 NW2d 346 (1982).

Addressing separation of powers, the United States Supreme Court stated in *Mistretta v United States,* 488 US 361, 380-381; 109 S Ct 647; 102 L Ed 2d 714 (1989):

> Separation of powers . . . "d[oes] not mean that these [three] departments ought to have no *partial agency* in, or no *controul* over the acts of each other," but rather "that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution are subverted." The Federalist No. 47, pp 325-326 (J. Cooke ed 1961) (emphasis in original).

The constitutional separation of powers is concerned with " 'the encroachment or aggrandizement of one branch at the expense of the other,' " *Mistretta, supra* at 382 (citation omitted), and with disruptions of the "proper balance" between the branches that prevent one branch from "accomplishing its constitutionally assigned functions . . . ." *Morrison v Olson,* 487 US 654, 695; 108 S Ct 2597; 101 L Ed 2d 569 (1988).

Clearly, whenever an activity involves the functioning of more than one branch of government, the constitutional separation of powers is implicated and care must be taken to avoid running afoul of Const 1963, art 3, § 2. While the constitutional separation of powers forbids the *sharing* of powers by different branches, it does not in any way forbid two branches of government from exercising their *own* powers over the same subject matter. The different duties of the separate branches may sometimes require them to act upon the same set of circumstances. Indeed, this rou-

tinely occurs when, for example, the legislative and executive branches engage in negotiations over legislative measures, the former in pursuit of its authority under Const 1963, art 4, § 1 and the latter in pursuit of its authority under Const 1963, art 4, § 33, or art 5, §§ 17-20. In such cases, the powers of each branch remain discrete—the Legislature is exercising the legislative power and the executive is exercising the executive power—but they are brought to bear upon the same set of circumstances. There is no blending of powers but only a blending of governmental operations. The constitutional separation of powers does not prohibit the exercise of distinct powers by separate branches jointly in pursuit of a common end; rather, it only forbids one branch from exercising the powers of another branch. The separated *powers* of the branches do not overlap; however, the *exercise* of these powers often does. That is, the separate and distinct powers of two branches may often be focused on the same subject areas, and the operation of government may occasionally involve a blending of governmental responsibilities, but there is never a blending of powers or functions. The legislative branch always exercises the legislative power, the executive branch always exercises the executive power, and the judicial branch always exercises the judicial power.

Nor are the branches entitled to operate with absolute independence in those subject-matter areas in which other branches also possess a legitimate interest. I agree with the majority that the judicial branch, like the other branches, has ancillary inherent powers. But the majority, *ante* at 412, quoting the superseded original opinion of the Court in *Wayne Circuit*

*Judges v Wayne Co*, 383 Mich 10, 21; 172 NW2d 436 (1969), opinion of the Court superseded and the opinion by DETHMERS and BLACK adopted as the opinion of the Court on rehearing, 386 Mich 1; 190 NW2d 228 (1971), seamlessly moves from the proposition that the branches have " 'some ancillary inherent capacity to do things which are normally done by the other departments' " to the conclusion that such inherent authority is both "inherent and exclusive." *Ante* at 413. The majority assumes without authority that inherent powers are necessarily exclusive, despite the fact that such powers will generally relate to governmental matters over which another branch may also possess power. The branches are only entitled to exercise their own powers with independence, not the powers of other branches.[3] Thus, the only issue here is whether Act 374 results in one branch's impinging on another branch by exercising the other's function.

Both the local funding unit (the legislative branch) and the trial court (the judicial branch) have legitimate responsibilities relating to the operation of the trial courts that derive directly from the constitution and laws of Michigan. In whatever manner the legislative and judicial branches exercise their responsibilities with regard to the operation of the trial court system, there may be *potential* concerns that either branch will overstep its proper boundaries and attempt to exercise or usurp the functions of the other. But these are no different than the constitu-

---

[3] An "hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively." *Buckley v Valeo*, 424 US 1, 121; 96 S Ct 612; 46 L Ed 2d 659 (1976).

tional tensions that exist with respect to other subject matters regarding which the legitimate interests of separate branches intersect. To name but a few, these would include: tensions between the legislative and executive branches over the latter's implementation of the former's regulatory enactments, tensions between the executive and judicial branches over the latter's supervision of public institutions pursuant to affirmative injunctions, and tensions between the executive and legislative branches over spending restrictions in appropriation measures. Such tensions are a routine part of a constitutional system in which governmental powers are dispersed among separate branches in order to impose checks and balances upon, and thereby to limit, the exercise of governmental power.[4]

As noted by the majority, the Michigan Supreme Court considered the separation of powers implications of Act 374 and set forth guidelines for implementing it in Administrative Order No. 1997-6, which states in pertinent part:

> The principle of separation of powers requires that the fundamental and ultimate responsibility for all aspects of trial court operations, including personnel matters, resides within the judicial branch. . . . Effective management of the operation of a trial court, however, also requires a positive working relationship between chief judges and the local funding units of their courts in the exercise of shared

---

[4] "Checks and balances" can be defined in effect as the overlapping application of the separate powers of the branches to a common subject matter. While the concept of "checks and balances" contemplates a less than "pure" form of separation of powers, it does not contradict this constitutional principle but rather complements it. Without the ability to withstand encroachments, a branch might be unable to perform the functions assigned to it within a governmental structure characterized by a separation of powers.

responsibility to the public. In addition to protecting the managerial responsibilities of the judiciary over its branch of government, the principle of separation of powers protects local funding units in their own area of fundamental responsibility: the appropriation of public dollars. Given the separate responsibilities of the judiciary and the court's funding units, the application of the principle of separation of powers to the operation of trial courts requires a practical reconciliation of the separate constitutional spheres of the legislative and judicial branches where those spheres intersect.

Whatever the undeniable potential for friction between the legislative and judicial branches in exercising their separate spheres of authority over the trial courts, Administrative Order No. 1997-6 recognizes that there is, in fact, a history in Michigan of reasonable cooperation between the two branches with respect to this responsibility.[5] In circuits and districts with a history of financing by the local unit (such as a county board of commissioners), the precise relationship between the local unit and the court, and the exact allocation of responsibilities, has differed considerably from court to court. Yet only a

---

[5] I do not assume, as the majority opinion implicitly does, that the legislative branch, in carrying out its legitimate responsibilities under Act 374, will feel compelled in every instance to exercise the fullest measure of its power where such exercise may approach or even cross the dividing line between its primary responsibilities and those of the judicial branch. It is not at all inconsistent with the constitutional separation of powers that one branch may decide, as a policy matter, to use restraint in the exercise of its powers in order to avoid conflict and confrontation with another branch or to promote cooperative decision making. See *Univ of Michigan Regents v Michigan*, 395 Mich 52, 70-71; 235 NW2d 1 (1975). "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co v Sawyer*, 343 US 579, 635; 72 S Ct 863; 96 L Ed 1153 (1952) (Jackson, J., concurring).

small handful of the variety of relationships so worked out has been the subject of prior constitutional challenge. The majority nonetheless concludes that Act 374 prescribes an unconstitutional relationship between the local unit and trial court without considering the full range of these relationships, the vast number of which would be compatible with the act. There is no single method by which the branches must structure their relationships in order to avoid violating the constitutional separation of powers. The constitutional separation of powers does not inhibit experimentation and innovation in addressing subject matters regarding which different branches possess intersecting responsibilities. It only requires that whatever relationship is devised does not impinge on the constitutional function of any branch by allowing another branch to exercise its powers.

Indeed, I note that before the enactment of Act 374, the employees of both the Third Circuit Court and the 36th District Court were employed by the State Judicial Council. The State Judicial Council consisted of the State Court Administrator, a constitutional officer of the judicial branch, Const 1963, art 6, § 3, *Wayne Circuit Judges, supra,* 386 Mich 9; two judges each from the circuit court, the probate court, and the district court, appointed and removable for cause by the Chief Justice; and the director of the Department of Management and Budget, a gubernatorial appointee serving at the pleasure of the Chief Executive, Const 1963, art 5, § 3; MCL 18.1121 and 18.1123; MSA 3.516(121) and 3.516(123). MCL 600.9101; MSA 27A.9101 (repealed by Act 374). The judicial members of the council, in exercising their statutory responsibilities, particularly including the negotiation

of collective bargaining agreements with employees of the Third Circuit Court, the Recorder's Court, and the 36th District Court, were required to vote as a bloc in order to preclude the possibility of a veto by the director of the Department of Management and Budget. MCL 600.9104(2); MSA 27A.9104(2) (repealed by Act 374). Further, the Legislature specifically provided that no increase in compensation under a collective bargaining agreement could be implemented if either house of the Legislature rejected it within sixty days of transmittal of the agreement. MCL 600.9107(1); MSA 27A.9107(1) (repealed by Act 374).[6] Thus, at least since 1981, the employees at issue were the employees of an entity representing a combination of the judicial and executive branches, in which the executive had a partial veto power, over which the legislative branch reserved a one-house veto power with regard to economic issues, and with respect to which, even in the absence of a legislative veto, the Governor possessed a line-item veto over any appropriation. Const 1963, art 5, § 19. Accordingly, it is hard to understand why these employees should now claim that Act 374 undermines the constitutional separation of powers when they operated under the previous arrangement without apparent objection or difficulty.[7]

---

[6] The council was abolished by repeal of these provisions of the Revised Judicature Act by Act 374.

[7] I am cognizant that the constitutionality of this previous arrangement is not before this Court. My sole purpose in mentioning the arrangement is to note the anomaly of the present separation of powers challenge to Act 374 in the context of a history of acceptance of a previous arrangement that was marked by considerable involvement on the part of the legislative and executive branches in personnel matters relating to employees serving in the judiciary. The majority, *ante* at 423, n 26, seeks to explain the lack of objection to the prior arrangement on the basis of "the

The presumption that statutes are constitutional, *Mahaffey, supra*, and the requirement that "no set of circumstances exist" under which Act 374 would be valid before it can be declared facially unconstitutional, *Council of Organizations, supra*, clearly require more than a mere *potential* for overreaching in order for provisions of Act 374 to be struck down as violative of the constitutional separation of powers. Similarly, the ripeness doctrine requires that there be an actual and live existing controversy, rather than merely a potential one, before a court may exercise its judicial powers. Ripeness is a constitutional doctrine that exists as a limitation on the judiciary's authority to address and adjudicate constitutional questions.[8] It is a function both of prudential

---

state fully funding the operations of the participating courts, relieving local government of a sizable financial burden." While this point is historically accurate, it is entirely unrelated to the collective bargaining issues involved in the present lawsuit because the county and the city, who now must shoulder the burdens of funding the courts, are not plaintiffs and have not raised any challenge to the Legislature's division of collective bargaining responsibilities. Neither the JAA nor the GAA can have any legally cognizable interest in the identity of the funding source, state or local, for the employee remuneration and benefits that they are able to negotiate on behalf of their members. Their sole legitimate interest is in being able to collectively bargain in a binding manner—something they may not be able to do now that the majority, albeit at the JAA and GAA's invitation, has denied the county any role in the collective bargaining process. See *infra*, n 23.

[8] A cardinal limitation on the judicial power of constitutional review is " 'never to anticipate a question of constitutional law in advance of the necessity of deciding it . . . .' " *Liverpool, New York & Philadelphia Steamship Co v Comm'rs of Emigration*, 113 US 33, 39; 5 S Ct 352; 28 L Ed 899 (1885), quoted in *United States v Raines*, 362 US 17, 21; 80 S Ct 519; 4 L Ed 2d 524 (1960). Because ripeness is a limit on a court's authority to adjudicate, it is appropriate for a court to consider ripeness sua sponte even if the parties do not raise it. This Court is under standing orders, as it were, to always inquire into the bona fides of our jurisdiction sua sponte. *Fox v Univ of Michigan Bd of Regents*, 375 Mich 238, 242; 134 NW2d 146 (1965). That refusing to consider an issue on the basis of lack of ripeness might, as the majority asserts, *ante* at 423, be viewed as

limitations on constitutional adjudication and the "case or controversy" limitations on judicial jurisdiction imposed by US Const, art III, § 2 and Const 1963, art 6, § 1, *New York v Ferber*, 458 US 747, 767-768 & n 20; 102 S Ct 3348; 73 L Ed 2d 1113 (1982); *Request for Advisory Opinion on Constitutionality of 1997 PA 108*, 402 Mich 83, 86; 260 NW2d 436 (1977). Only the judicial power is bestowed upon the judiciary. As the United States Supreme Court has observed:

> The power of courts . . . to pass upon the constitutionality of acts of Congress arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough. . . . The Constitution allots the nation's judicial power to the federal courts. Unless these courts respect the limits of that unique authority, they intrude upon powers vested in the legislative or executive branches. Judicial adherence to the doctrine of the separation of powers preserves the courts for the decision of issues, between litigants, capable of effective determination. Judicial exposition upon political proposals is permissible only when necessary to decide definite issues between litigants. When the courts act continually within these constitutionally imposed boundaries of their power, their ability to perform their function as a balance for the people's protection against abuse of power by other branches of government remains unimpaired. Should the courts seek to expand their power so as to bring under their jurisdiction ill-defined controversies over constitutional issues, they would become the organ of political theories. Such abuse of judicial power would properly meet rebuke and restriction from other branches. By these mutual checks and balances by and

---

"inviting litigation" at some future date, if and when the issue becomes ripe, is no argument for not honoring the ripeness doctrine. Indeed, such an argument would effectively vitiate the doctrine altogether because it is hard to conceive of a circumstance in which it could not be invoked.

between the branches of government, democracy undertakes to preserve the liberties of the people from excessive concentrations of authority. [*United Public Workers of America (CIO) v Mitchell*, 330 US 75, 89-91; 67 S Ct 556; 91 L Ed 754 (1947).]

The Michigan Supreme Court stated in *General Motors Corp v Attorney General*, 294 Mich 558, 568; 293 NW 751 (1940):

> The court will not go out of its way to test the operation of a law under every conceivable set of circumstances. The court can only determine the validity of an act in the light of the facts before it. Constitutional questions are not to be dealt with in the abstract. *Bandini Petroleum Co v Superior Court*, 284 US 8 (52 S Ct 103, 78 ALR 826) [1931]; 11 Am Jur p 753, § 111, and cases cited in note 18.

Here, Act 374 could be construed or applied in many ways, in many combinations and permutations, anticipated and unanticipated, some of which would engender no serious constitutional difficulties and others of which might be inconsistent with Const 1963, art 3, § 2 in whole or in part. Is there no arrangement of responsibilities between the local unit and the court possible under Act 374 that the majority would find consistent with the Michigan Constitution? Is it at all relevant that this Court has not yet been presented with an intractable dispute between the two branches under Act 374?[9] Can the majority truly conceive of no circumstances under which the two branches could cooperatively structure their court system without

---

[9] A fundamental precept of constitutional law is that when two branches of government pursue a common policy on the basis of mutual agreement, the strongest presumption of constitutionality attends their actions. *Youngstown*, n 5, *supra* at 635 (Jackson, J., concurring). See n 2, *supra*.

running afoul of the constitution?[10] Where a constitu-

---

[10] To answer the majority's inquiry regarding how the statute could conceivably operate in a constitutional manner, I suggest the following possible situations in which subsection 593a(5) could arguably operate without running afoul of separation of powers concerns:

1. The county, pursuant to subsection 593a(6), appoints the chief judge as its agent for collective bargaining, and subsequently ratifies the contract as negotiated;

2. The chief judge, pursuant to subsection 593a(6), appoints the county (or the county's representative) as agent for collective bargaining, and subsequently ratifies the contract as negotiated;

3. The county and the chief judge are separately represented, but as each issue for negotiation arises, these agents confer and reach accord regarding the position to be taken;

4. The county and the chief judge are separately represented, and with regard to some noneconomic issue their respective representatives differ; the chief judge prevails under subsection 593a(5)(b), which even the majority concedes must be constitutional (because it identifies a constitutional imperative pursuant to which the chief judge must be able to act unilaterally);

5. The county and the chief judge are separately represented, and with regard to some economic issue their respective representatives differ; if the chief judge can make a compelling case to establish that the funding necessary to implement his position is minimally required for the court to fulfill its constitutional responsibilities, the chief judge prevails under *Wayne Circuit Judges, supra*;

6. The county and the chief judge are separately represented, and with regard to some economic issue their respective representatives differ; the chief judge is unable to make a compelling case to establish that the funding necessary to implement his position is minimally required for the court to fulfill its constitutional responsibilities; the county allows the chief judge full leeway to resolve the problem as he chooses within the parameters of a lump sum budget; again, there is no constitutional difficulty. *Ottawa Co Controller v Ottawa Probate Judge*, 156 Mich App 594, 603-604; 401 NW2d 869 (1986).

There may well be additional categories of situations where constitutional difficulties would not necessarily arise. And, of course, when an actual problem *does* arise, a justiciable constitutional controversy will then be ripe for decision. Until that time, "wisdom demands abstention until a specific impasse is presented." *Univ of Michigan Regents*, n 8, *supra* at 70.

Further, notwithstanding the majority's suggestion in n 27, *ante*, p 423, that it is inconsistent to conclude both that the constitutional issues here are not ripe for review and that Act 374 is not facially invalid, it is hard to understand how the former conclusion could ever be drawn absent some inquiry into the latter.

tional issue is presented anticipatorily, the Court is *required* to decline to rule with regard to the question. *Sullivan v Michigan State Bd of Dentistry*, 268 Mich 427, 429-430; 256 NW 471 (1934).

Neither the parties nor the majority points to any existing controversy between the Third Circuit Court, or its chief judge, and the Wayne County Board of Commissioners, with respect to the compensation, fringe benefits, pensions, holidays, or leave policies applicable to nonclerical employees of the Third Circuit Court. The chief judge remains wholly unfettered in deciding whom to appoint, promote, demote, or discharge, what positions to create and the responsibilities and functions to be assigned, when the work day starts and ends, the time allowed for meals or rest breaks, the number of employees, whether they shall be employed on an at-will, just-cause, or some other basis, their personnel hierarchy, including to whom they shall report, and all other such details of the employer-employee relationship. To the extent that it is able to demonstrate that a particular level of compensation, or package of fringe benefits, pension benefits, holidays, and leave allowances are necessary to fulfill the minimum demands of the court in terms of adjudicating its caseload of civil and criminal litigation, the circuit court also has full authority over economic issues as well. *Wayne Circuit Judges, supra.* Once those minimum requirements are met, however, the court, whether it or the county is the formal "employer" of the court's employees, must structure the compensation, fringe benefits, pension benefits, holidays, and leave allowances of those employees within the constraints of its budgetary appropriation from the county. Whatever the "inherent" powers of

the judiciary, to this extent they are transcended by the Legislature's power of the purse. *Univ of Michigan Regents v Michigan*, 395 Mich 52, 70-71; 235 NW2d 1 (1975).

Outside the context of the First Amendment, "[g]enerally, facial challenges to legislation are disfavored." *Michigan Up & Out of Poverty Now Coalition v Michigan*, 210 Mich App 162, 170; 533 NW2d 339 (1995). However, the majority nonetheless strikes down a number of provisions of Act 374 that are plainly not ripe for decision.[11]

First, the majority, *ante* at 415, strikes down subsection 593a(3) of Act 374, contending that it is an

---

[11] The majority appears to conclude that the constitutional challenge based on separation of powers is ripe because it perceives that the mere existence of subsection 593a(5)(a) so alters the political balance between the judiciary and applicable funding units—in this instance, between the Third Circuit Court and the Wayne County Board of Commissioners—that it constitutes an affront to Const 1963, art 3, § 2. A similar argument was made by disgruntled members of Congress (the constitutional principals in that case in contrast to the constitutional "proxies" involved in the instant case) in *Raines v Byrd*, 521 US ___; 117 S Ct 2312, 2316; 138 L Ed 2d 849, 857 (1997), where challenged legislation was attacked as creating "unanticipated and unwelcome subservience" by one branch of government to another solely by virtue of its enactment, even though the statute (the line item veto) had not yet been invoked. In rejecting the argument as unripe, the United States Supreme Court explained that ripeness is a corollary of standing, and noted that

> our standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional. . . . As we said in *Allen [v Wright*, 468 US 737, 752; 104 S Ct 3315; 82 L Ed 2d 556 (1984)], "the law of Art III standing is built on a single basic idea—the idea of separation of powers." [*Raines, supra*, 521 US ___; 117 S Ct 2317-2318; 138 L Ed 2d 858.]

Thus, it is ironic that, by addressing the merits of the instant controversy in order to declare that the statute violates the constitutional separation of powers, the majority itself has arguably run afoul of this same principle.

"outright takeover of the court's employees."[12] Subsection 593a(3) states that employees serving in the court are employees of Wayne County (given the failure of the Wayne County Board of Commissioners to create a Wayne County Judicial Council).[13] This is merely a declaration of status and must be read in the larger context of Act 374; to render this declaration of status dispositive of the present constitutional controversy, without considering the surrounding structure and language of the statute, is to subordinate substance to form. See *Johnston v Livonia*, 177 Mich App 200, 208; 441 NW2d 41 (1989). Subsections 593a(4)-(9) of Act 374 clearly indicate the court's continuing authority over employees serving in the court despite the formal designation of Wayne County as the "employer" of these employees.[14] Accordingly,

---

[12] The majority also strikes down portions of subsections 593a(6), (8), (10), (11), (12), and (13) because they depend on the definition of "employer" in subsections 593a(3).

[13] I note, as does the majority, that § 593a is constructed similarly to provisions of Act 374 that are not at issue in the instant litigation, specifically §§ 591(4), 8271(6) and 8274(5).

[14] Section 593(a) both designates Wayne County as the "employer" of employees serving in the judiciary and states that the court has continuing authority over such employees. It clearly indicates a cooperative relationship between these two entities and a role for both in collective bargaining. Contrary to the majority's contention, *ante* at 424, Act 374 does not leave plaintiffs "in need of direction regarding the identity of their employer." Apart from this, however, it is difficult to understand the majority's basis for viewing the collective bargaining process as one in which one party can be heard to object to the manner in which the opposite party chooses to be represented. Whether the chief judge appears personally or by agent, whether the Wayne County Board of Commissioners appears through a representative or in the person of its individual commissioners en masse, and whether the chief judge designates the same agent as the board of commissioners, the JAA and the GAA have only to sit down at the negotiating table and bargain with whomever, on behalf of the employer, appears. If no authorized representative appears, the unions may properly pursue an unfair labor practice charge before the appropriate administrative agency.

whether the designation in subsection 593a(3) of
Wayne County as "employer" violates the constitu-
tional separation of powers, in my judgment, will not
be ripe until Wayne County takes some action regard-
ing an employee to which the court objects, the two
branches are subsequently unable to negotiate a reso-
lution, Wayne County proceeds unilaterally in reliance
on this provision, and the court initiates a lawsuit
against the county. This has not yet occurred.
Whether this provision violates the constitutional sep-
aration of powers turns on whether one branch is
preventing another branch from exercising its consti-
tutionally assigned function.[15] Here, while Act 374

---

[15] I have discovered no cases that hold that a statute that makes one
branch the employer of personnel working in another branch necessarily
violates the constitutional separation of powers. *Beadling v Governor*, 106
Mich App 530, 536; 308 NW2d 269 (1981), held that the reinstatement by
the executive branch of a discharged employee of the legislative branch
violated the constitutional separation of powers. However, this holding
turned on the fact that the position at issue was one "of some sensitivity
within the legislative process" and that to permit executive overview of
the position would "allow a dangerous incursion into the legislative
realm." *Id.* at 536. In *Ottawa*, n 10, *supra* at 603, this Court held that a
court is "the employer of court personnel for purposes of salary negotia-
tions" and has authority to set "reasonable salaries for its necessary
employees in the first instance, as long as it remains within its total
budget appropriation." In reaching this conclusion, the *Ottawa* Court
relied on *Judges of the 74th Judicial Dist v Bay Co*, 385 Mich 710; 190
NW2d 219 (1971), for the proposition that district courts rather than the
local units have authority to set salaries and *Livingston Co v Livingston
Circuit Judge*, 393 Mich 265; 225 NW2d 352 (1975), which the *Ottawa*
Court contended extended the *Bay Co* holding to employees serving in
the circuit and probate courts. *Ottawa, supra* at 602-603. However, *Bay
Co* turned on statutory rather than constitutional analysis. *Bay Co, supra*
at 726-727. That the *Bay Co* Court, *supra* at 727, stated that its holding
was "consonant" with constitutional principles does not mean that its
holding is constitutionally required. *Livingston Co* held only that the spe-
cific bargaining process that it considered—in which the judiciary bar-
gained with the employees and the contract was submitted to the State
Court Administrator for approval, with the local funding unit provided an
opportunity to present its views to the administrator—did not violate the
constitutional separation of powers. Finally, in *Gray v Clerk of Common*

designates Wayne County as the "employer," it clearly contemplates a critical role for the judiciary in exercising authority over employees serving in the judiciary, including a role in collective bargaining.[16] While the *form* of a governmental relationship is relevant in assessing the extent to which it comports with the constitutional separation of powers, so too is the *substance* of such a relationship.

Plaintiffs have done little more in their pleadings than invoke the county's status as the "employer" of court personnel. They have done nothing to demonstrate that such status by itself will undermine the ability of the courts to carry out the judicial function or that such status presupposes some relationship that will undermine this ability. Nor have they demonstrated that the statute does not advance the legitimate interests of the counties in performing their legislative function. Accordingly, I do not believe that

---

*Pleas Court,* 366 Mich 588, 594; 115 NW2d 411 (1962), the Court held that the common pleas court had authority "under the statute" to remove a bailiff. Further, there are a number of instances in which employees of one branch of government serve in another branch. County clerks are an example of employees who work closely with the judiciary, yet are not employees of the court. The county clerk is the clerk of every circuit court. Const 1963, art 6, § 14. Although county clerks and their deputies work closely with the judicial branch, their salaries may be fixed by the state or local legislature free from judicial interference. *Bartkowiak v Wayne Co,* 341 Mich 333, 342-344; 67 NW2d 96 (1954). The classification of deputy clerks within the classified civil service of the county executive does not violate separation of powers doctrines. *Sabbe v Wayne Co,* 322 Mich 501; 33 NW2d 921 (1948); *Duncan v Wayne Co,* 316 Mich 513; 25 NW2d 605 (1947). Administrative agencies are an example of entities that often act in a quasi-judicial capacity but are part of the executive branch. *Bay Co, supra* at 727.

[16] The majority's primary concern appears to be authority over personnel matters. However, nothing in Act 374 restricts the judiciary's authority over the core personnel matters of hiring, firing, and discipline. Further, Act 374 has no effect on any employees serving in the judiciary who are not subject to collective bargaining.

the designation in subsection 593a(3) of Wayne County as the "employer," on its face, impinges on the judiciary by enabling the legislative branch to usurp the judicial function. While the judiciary understandably would prefer that Act 374 designate the court as the sole employer of employees serving in its branch, the issue before us is whether subsection 593a(3) violates the constitutional separation of powers. Facially, subsection 593a(3) does not violate the constitutional separation of powers; whether, in practice, a local unit will impinge on the judiciary's constitutional functions by virtue of this provision is an issue that is not currently ripe for adjudication.

The majority, *ante* at 418, next strikes down subsection 593a(4) because it allows the county "to share the court's inherent and exclusive authority over all personnel matters" and subsection 593a(5) because it "divides the inherent managerial powers of the judiciary between the court and the county." Section 593a(4) states that the "employer" designated in subsection 593a(3), in concurrence with the chief judge, has authority (a) over personnel policies relating to specified subject matters and (b) to enter into collective bargaining agreements. That Wayne County, in concurrence with the court, has some authority over employees serving in the judiciary becomes potentially problematic only if the two branches disagree over some matter. Subsection 593a(5) sets forth a division of authority between the local funding unit and the court in the event of an impasse regarding the subject matters listed in subsection 593a(4)(a). In order for the question of the constitutionality of subsections 593a(4) and (5) to be ripe, the local unit and the court would have to reach an impasse that would

lay the groundwork for invoking subsection 593a(5) and the legislative and judicial representatives would then have to disagree on their respective limits of authority to the extent that one entity sued the other. This has not yet occurred. In any event, I note that, although the impasse provisions of subsection 593a(5) appear to place certain subjects relating to employees serving in the court beyond the authority of the court in the event of an impasse, a closer look at this division of authority demonstrates that the subject matters committed to the authority of the local unit are those strictly relating to finances—the legitimate *legislative* concern of the local unit—while all other authority regarding personnel is committed to the court.[17] These provisions represent a good-faith effort by the Michigan Legislature to roughly restate presently recognized spheres of authority on the part of local units and the judiciary in the operation of the trial courts.[18] The majority would reach beyond the

---

[17] Moreover, the subject matters listed in the event of impasse are defined broadly and are not necessarily mutually exclusive. For example, while leave time is committed to the authority of the local unit, employee discipline, which is committed to the authority of the court, may involve the misuse of leave time. Similarly, compensation is committed to the authority of the local unit, but grievances, which are committed to the authority of the court, may involve compensation. Thus, the impasse provisions do not purport to prescribe in detail specific subject matters over which one of the two branches has exclusive authority but merely recognize the general interests that each branch has regarding court employees. In precisely those areas in which the interests of the branches most closely intersect, I believe that the impasse provisions are least clear in precisely ascertaining the branch in which a particular controversy is to be finally resolved. Thus, the division of authority set out in these provisions is not clearly inconsistent with the requirements of the constitutional separation of powers.

[18] Indeed, I see this portion of the statute as an effort to declare existing relationships between the legislative and judicial branches as established by prior case law. The legislative branch has the initial prerogative with regard to the matters that Act 374 confides to it. Only if, in the

necessities of the present case to strike down this attempt to forestall future conflicts between these branches.

None of the events necessary to transform these potential separation of powers concerns into actual and concrete "cases and controversies" (US Const, art III, § 2) has occurred, yet they are prematurely decided here by the majority.[19] There is currently no ripe separation of powers controversy for this Court to decide. See *Michigan Up & Out of Poverty Coalition, supra* at 170, n 5. Accordingly, I conclude that the constitutionality of Act 374 ought not to be resolved on this record, at this time. When and if a conflict arises between a local funding unit and a

---

exercise of its prerogative over the purse strings, the local unit leaves the court with insufficient resources to carry out its judicial functions, or otherwise interferes with the judicial function, may the judiciary, under the inherent power doctrine, require the legislative branch to withdraw from an exercise of power. *Second Dist Court, supra* at 724. No such interference is reflected in the present record. That there may be a potential for separation of powers problems does not warrant this Court in resolving such thorny problems in the abstract, without a proper case or controversy. *Univ of Michigan Regents, supra* at 66-67, 69-70. Public confidence in any judicial resolution of such issues will be fostered by awaiting a proper record for further development of the constitutional question of separation of powers. *Second Dist Court, supra* at 725. I am aware of no Michigan case in which a statute has been held to violate the constitutional separation of powers solely on the basis of the possibility of a potential conflict at some unspecified future date. This Court does not to have the power to issue advisory opinions and ought not to arrogate this extraordinary authority to itself. See Const 1963, art 3, § 8.

[19] The majority, *ante* at 422, n 25, suggests that I "mischaracterize" them as striking down several provisions of Act 374 on the basis of a *potential* for overreaching by the local funding unit. How else can their action be characterized in the absence of an *actual* case or controversy? In the absence of an actual case or controversy, any "case or controversy" must necessarily be, at best, potential. And a potential "case or controversy" is no case or controversy at all. While the majority may prefer to avoid the explicit use of the term "potential," the decision of the trial court that they affirm in this regard correctly recognized that § 593 could only be rendered unconstitutional at this time on this basis.

court that they are unable to resolve among themselves, the determination of any constitutional separation of powers violation will turn on the precise contours of the dispute. The admittedly experimental effort by the Legislature to minimize potential conflicts between counties and courts by mandating joint involvement in the collective bargaining process should be given an opportunity to play itself out in the real world; only if an irreconcilable conflict between the branches occurs, or otherwise if there is evidence that the performance of the judicial function has been undermined, should this Court presume to address the constitutional questions raised here.

There is nothing on the face of Act 374 or the particular provisions struck down by the majority that makes it certain, or even more likely than not, that any discrete judicial function of the trial court will be impaired. Under Act 374, the legislative branch retains complete control over its constitutional functions and the judiciary retains complete control over its constitutional functions with respect to operation of the trial courts. If, in practice, that does not prove to be true, this Court should be vigilant in striking down such usurpations. Obviously, the relationship between the branches described in Act 374 raises the potential that constitutional separation of powers disputes may arise in the future. These, however, are less a function of Act 374 than they are a function of the constitution's apportionment of powers between the legislative and judicial branches. For the present, the arising of such disputes remains speculative and uncertain. The "potential" for such disputes, expressly set forth by the trial court as the standard for assessing violations of art 3, § 2 and implicitly adopted here

by the majority, is widespread throughout our constitutional system. It often may be the case that one branch will have to assert itself in order to ensure that potential conflicts do not ripen into actual conflicts; further, when actual conflicts, in fact, arise, it is normally the political rather than the judicial process that works out such conflicts. Only when such conflicts prove too stubborn to be politically resolved, and when the ability of a branch to perform its constitutional obligations is thereby undermined, is the dispute typically transformed into a justiciable controversy into which the courts must be drawn. *Second Dist Court, supra* at 724-725.[20]

It will be in its actual implementation across the state that the constitutional parameters of Act 374 will be determined. Accordingly, I do not believe that there is currently any basis for transforming potential violations into actual violations. See *Second Dist Court, supra* at 722, in which the Court held that there was no basis on the record before it for determining under what circumstances the judiciary could compel expenditures beyond those appropriated because it was undisputed that the court was *then* functioning at a satisfactory level. Further, I note that neither the local units nor the trial courts have challenged the statute on separation of powers grounds. That neither of the affected branches of government

---

[20] I note that *Morrison, supra* at 693, suggested that the relevant test for determining a separation of powers violation under the federal constitution was not whether one branch was exercising the function of another but whether an action "sufficiently" deprived one branch of control such that it "interfere[d] impermissibly" with a constitutional function. Here, I apply the more stringent and less deferential "exercising the function of another branch" test and still conclude that Act 374 is not unconstitutional on its face under Const 1963, art 3, § 2.

is raising separation of powers concerns is significant
evidence that there is no present separation of pow-
ers issue to adjudicate.[21]   For these reasons, while
caution and judgment must be exercised in the imple-
mentation of Act 374   to avoid separation of powers
violations of the sort foreseen in Administrative Order
No. 1997-6,   I believe that the constitutional claims
raised here are not currently ripe for adjudication.[22]

---

[21] Because, in my judgment, it is unnecessary to the resolution of this
case, I do not address the issue whether the GAA and the JAA have standing
to raise a separation of powers claim, as they urge here, where neither of
the affected branches themselves, or their individual members, is raising
such a claim. Given its contrary resolution of the constitutional issues in
this case, the majority opinion implicitly concludes that such standing
exists. See *Raines v Byrd*, n 11, *supra*, regarding the importance of strict
compliance with the standing requirement. As in *Raines*, n 11, *supra* at
521 US ___; 117 S Ct 2322; 138 L Ed 2d 864, plaintiffs "have alleged no
injury to themselves as individuals . . . the institutional injury they allege
is wholly abstract and widely dispersed . . . and their attempt to litigate
this dispute at this time and in this form is contrary to historical experi-
ence. We attach some importance to the fact that [plaintiffs] have not
been authorized to represent [the allegedly aggrieved branch of govern-
ment] in this action . . . ."

[22] Even if one accepts arguendo the facial invalidity of subsection
593a(3),   which declares that, given the failure to create the Wayne
County Judicial Council, Wayne County, rather than the Third Circuit
Court, shall be the "employer" of the nonclerical employees of the Third
Circuit, there is little justification for also declaring unconstitutional other
subparagraphs of § 593a.  Having reached the conclusion that the Legisla-
ture was constitutionally obligated to declare the circuit court the
"employer" of its nonclerical employees, the majority, in my judgment,
fails to justify the extent to which this warrants striking down each of the
provisions of § 593a. All that would be necessary is to recognize that any
reference to "employer" in other portions of § 593a  must be construed as
referring to "the circuit court," or, as appropriate, "the Recorder's Court,"
or the "chief judge" of either court. This does the least violence to the oth-
erwise constitutional (indeed, unchallenged with regard to constitutional-
ity) effort of the Legislature to extend collective bargaining to employees
of the circuit courts. This also does the least violence to the efforts of the
Legislature to authorize but not mandate the circuit court to establish per-
sonnel policies and procedures, subsections 593a(4)(a) and (b);   to
authorize but not mandate the circuit court or the chief judge to appoint
an agent for collective bargaining, subsection 593a(6);  and to provide, for
the benefit of the employees subject to the collective bargaining process

The majority nonetheless addresses the separation of powers claims and strikes down a number of provisions of Act 374 as unconstitutional. The majority then concludes that these provisions, cumulatively, can be severed from the remainder of the statute and that Act 374, even with these provisions deleted, remains effective. Respectfully, I question whether Act 374 has not been so substantially altered by the majority that to sustain what is left of it following their surgery would be contrary to the intent of the Legislature.

As stated by the majority, when a statutory provision is found unconstitutional, a determination regarding its severability from the rest of the statute is required. MCL 8.5; MSA 2.216 states:

> In the construction of the statutes of this state the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the legislature, that is to say:
>
> If any portion of an act or the application thereof to any person or circumstances shall be found to be invalid by a court, such invalidity shall not affect the remaining portions or applications of the act which can be given effect without the invalid portion or application, provided such remaining portions are not determined by the court to be inoperable, and to this end acts are declared to be severable.

---

and personnel policy and procedure process, that the court shall adhere to such policies as it has opted to establish in appointing, supervising, disciplining, or dismissing its employees, subject to the requirements of any collective bargaining agreement, subsection 593a(8).

Notwithstanding the assertion in the majority opinion, *ante* at 425, n 29, that I "suggest" that § 593a be rewritten in any particular way, I have only suggested that, *if the majority is determined to recast this section*, then it would have been better for this Court to have recast this provision in a manner that "seek[s] to save what we can of the Michigan statutes." *People v Bricker*, 389 Mich 524, 529; 208 NW2d 172 (1973). This is a constitutional principle "well recognized and applied in our state." *Id.* at 531.

The law enforced after an invalid portion of an act is severed must be "reasonable in view of the act as originally drafted." *Citizens for Logical Alternatives & Responsible Environment v Clare Co Bd of Comm'rs*, 211 Mich App 494, 498; 536 NW2d 286 (1995). The Michigan Supreme Court has indicated that it is appropriate for a court to remedy a constitutional defect in a statute when it can do so "with no damage to the overall statutory scheme." *Day v W A Foote Memorial Hosp*, 412 Mich 698, 709; 316 NW2d 712 (1982).

The majority's excision of large portions of § 593a, because it finds subsection 593a(3) and related provisions, i.e., subsections 593a(4)-(6), (8), (10)-(13), unconstitutional, is highly problematic. Section 593a attempts to establish a cooperative relationship between the counties and the courts in administering the courts and exercising authority over their employees. It is intended, in part, to resolve any ambiguity concerning the identity of the employer, given a long history of contention dating back at least to *Wayne Circuit Judges, supra*, 383 Mich 10, 386 Mich 1.[23] Because court administration is a subject matter regarding which legislative and judicial functions intersect, and in light of the history of contention

---

[23] Further clarification of this issue is provided by subsection 593a(9), which states that in no event shall such personnel be deemed employees of the state or the state be liable for the tortious misconduct of such governmental agents or for funding of their contractual claims. I express no opinion regarding the effect of which entity is designated as the employer of employees serving in the court on the issue of which entity is responsible for tort judgments involving court employees. See *Cameron v Monroe Co Probate Court*, 214 Mich App 681; 543 NW2d 71 (1995), lv gtd 454 Mich 892 (1997).

regarding the branches' respective roles in administering the courts, it is logical for the Legislature to address these concerns in the context of court reorganization legislation. Section 593a, in which the Legislature lays out its plan for court administration, contains significant provisions of Act 374. The majority would delete most of the provisions of § 593a without seriously evaluating whether the Legislature would have enacted Act 374 in the absence of such provisions. I question whether these provisions can be severed from the act "with no damage to the overall statutory scheme," *Day, supra* at 709, and whether enforcement of the act after severance of most of § 593a is "reasonable in view of the act as originally drafted." *Citizens for Logical Alternatives, supra* at 498.

The majority-amended version of Act 374 gives no apparent effect to the clear legislative intent to involve both the local unit and the court in exercising authority over and collectively bargaining with employees serving in the court. Indeed, the majority-amended statute does not indicate at all which party is authorized to enter into a collective bargaining contract with the employees at issue. Additionally, by removing the local units from any clear role with respect to these responsibilities, I believe that the majority is giving inadequate consideration to the political processes that led to the instant statute. Specifically, it is unclear whether reorganization of the courts under Act 374 would have garnered sufficient political support without the provisions setting forth a role for the local funding units in court administration. I do not believe that this Court can altogether

disregard the political realities surrounding the enact-
ment of a statute where we strike down important
provisions of the statute while seeking to maintain
the viability of the remaining provisions.[24] But for the

---

[24] Not the least of the considerations involved in judicial decisions to
sever unconstitutional provisions from a larger statute is the extent to
which unintended policy consequences may arise when the judicial
branch effectively establishes its own processes as an alternative to the
factfinding and decisionmaking processes of the legislative branch. One
such problem potentially arises here with respect to the effect of the mod-
ified statute on the public employee collective bargaining process. Under
1996 PA 374 as enacted, when the collective bargaining process results in
an agreement, that contract is legally enforceable, like any other contract,
because government agencies, acting within their powers, can legally
enter into contracts and sue and be sued thereon. However, now that the
majority has removed the Wayne County Board of Commissioners from
the equation, in an effort to give "direction" to the JAA and the GAA regard-
ing the "identity of their employer," any collective bargaining agreement
will be merely hortatory unless and until the county independently
decides to fund the agreement. *76th Judicial Dist Court v Teamsters
Local 580*, 1995 MERC Lab Op 160; *Roxborough v Michigan Unemploy-
ment Compensation Comm*, 309 Mich 505, 510; 15 NW2d 724 (1944);
(" 'Public officers have and can exercise only such powers as are con-
ferred on them by law, and a State is not bound by contracts made in its
behalf by its officers or agents without previous authority conferred by
statute or the Constitution.' ") (citation omitted). It is at the behest of the
collective bargaining representatives of these employees ("the persons
represented by plaintiffs JAA and GAA are presently in need of direction
regarding the identity of their employer," *ante* at 424) that the majority
declares the statute unconstitutional in part and thereby proceeds to
render the collective bargaining process unsettled for the very benefi-
ciaries of its decision. As *Sittler v Michigan College of Mining & Technol-
ogy Bd of Control*, 333 Mich 681; 53 NW2d 681 (1952), explicitly estab-
lishes, the JAA and the GAA—as with anyone else wishing to enter into a
contractual arrangement with a governmental agency—are required to
ascertain the power of either the chief judge or his agent, or of the county
or its representative, to negotiate and execute a binding collective bar-
gaining agreement. They proceed at their risk, if they choose to conclude
a contract with the chief judge alone, that the economic provisions of the
contract will not be funded by the county. Whatever the majority's view of
the demands of the constitutional separation of powers, the "power of the
purse" belongs exclusively to the legislative branch. Const 1963, art 4, § 1;
*Univ of Michigan Regents v Michigan, supra* at 70-71. Concomitantly, if
only the county is involved, and the chief judge has not designated the

adoption of the provisions of § 593a that the majority strikes down, it is not at all certain that the remainder of Act 374 would have been adopted in its present form or, indeed, that it would have been adopted at all. Evaluation of the "manifest intent of the legislature," MCL 8.5; MSA 2.216, while principally focused on the objective, statutory work product, must in fairness to the processes of the Legislature and to the interests involved therein, attempt at least some rudimentary analysis of the extent to which the stricken provisions contributed to the Legislature's approval of the statute. While admittedly such an analysis may often prove difficult, the essence of the severability analysis, in my judgment, is whether a legislative measure both *would* have and *could* have been adopted had it been cast in its judicially amended form. For these reasons, I do not believe that the majority has adequately addressed the severability issue and am considerably less confident than the majority that the Legislature would have enacted Act 374 in the form resulting from this Court's action.[25]

county as agent for the court, the unions may bargain conclusively over economic issues but questions of work schedules, discipline, grievances, personnel records, probation, hiring and termination practices, and other personnel matters may then be beyond the competence of the other side.

The majority, *ante* at 425, n 29, responds to all this by asking rhetorically: "What is new?" Well, of course, nothing at all is new. The problem merely is that the Legislature indicated that it *wanted* something new. As the result of this decision, the Legislature has been rebuffed in this regard and an amended process by which court employees could collectively bargain—at least arguably, a more effective and expedited process—has been replaced by the status quo ante.

[25] The majority's assertion, *ante* at 422, that, "[i]f the Legislature disagrees with our conclusion, it can repeal the remaining provisions of the act," only reinforces this lack of confidence. It is a much different proposition to say that the Legislature would not have adopted a measure in

In light of my conclusion that the provisions in Act 374 for joint authority over employees by the local unit and court are not facially violative of the constitutional separation of powers and, therefore, that constitutional issues arising under the act are not ripe for adjudication, I must address the claim regarding the public employment relations act (PERA), MCL 423.201 *et seq.;* MSA 17.455(1) *et seq.* The JAA and the GAA contend that the trial court erred in finding that § 593a did not violate the PERA. The PERA is the principal state law regulating public employment relations; it generally prevails over conflicting laws that do not specifically address collective bargaining. *Local 1383, Int'l Ass'n of Fire Fighters, AFL-CIO v City of Warren,* 411 Mich 642, 655; 311 NW2d 702 (1981). "A primary goal of the [PERA] is to resolve labor-management strife through collective bargaining." *Port Huron Ed Ass'n v Port Huron Area School Dist,* 452 Mich 309, 311; 550 NW2d 228 (1996). Under the PERA, a public employer must bargain collectively with representatives of its employees regarding wages, hours, and other terms and conditions of employment. MCL 423.215(1); MSA 17.455(15)(1); *Port Huron, supra* at 317. Here, the JAA and the GAA assert that § 593a strips their members of this statutory right to collectively bargain over the terms and conditions of their employment.

the first instance than it is to say that they are capable of repealing such measure after it has been amended by this Court. Precisely because of this difference, it is our obligation in undertaking the severability analysis to assess the Legislature's intent at the time of the enactment of legislation and not to reassure ourselves that Humpty Dumpty can be put together again in the form that the Legislature would have intended *after* we have transformed a statute.

First, the JAA and the GAA argue that the party designated by Act 374 as their employer, Wayne County, has no control over some of the mandatory subjects of bargaining. Subsection 593a(4)(b) provides that the county, in conjunction with the chief judge, has the authority to make and enter into collective bargaining agreements with representatives of its employees. Under subsection 593a(6), both the county and the chief judge may appoint an agent for collective bargaining purposes. Subsection 593a(7) indicates that the chief judge may elect not to participate, but Administrative Order No. 1997-6 requires a chief judge choosing not to directly participate in collective bargaining to designate a representative of a local funding unit to act on the court's behalf for purposes of collective bargaining. Even if choosing not to participate in the collective bargaining process, the chief judge's decisions regarding individual employees must be made in accordance with personnel policies and procedures and the collective bargaining agreement under subsection 593a(8). Upon review of this division of authority, the trial court determined that the coemployer relationship did not violate the PERA because the JAA and the GAA did not demonstrate that the coemployer relationship affected their ability to assert and enforce their rights under the PERA.

In *St Clair Prosecutor v AFSCME, Local 1518*, 425 Mich 204, 233; 388 NW2d 231 (1986), the Michigan Supreme Court recognized a coemployer status in collective bargaining. A "co-employer" is treated as an employer only for purposes of bargaining about areas within its control. *Id.* 224, n 2. In *St Clair Prosecutor*, the Court noted that the coemployer concept is espe-

cially relevant in matters of county government, where separately elected constitutional officers are given statutory authority to make personnel decisions with regard to their assistants. *Id.* at 233. The Court determined that the fact that coemployers require the bargaining unit's representative to bargain with more than one person did not appear to impose an undue burden on the collective bargaining process. *Id.* Contrary to plaintiff JAA's assertion, members of different branches of government may be considered coemployers for purposes of the PERA. *St Clair Prosecutor* involved a coemployer relationship between a county prosecutor, who is a member of the executive branch, *People v Trinity, supra* at 22; *People v Potts*, 45 Mich App 584, 589; 207 NW2d 170 (1973) (partial concurrence by HOLBROOK, P.J.), and a county, which in those circumstances was operating within the legislative sphere, *Alan v Wayne Co*, 388 Mich 210, 245; 200 NW2d 628 (1972). Moreover, as earlier discussed, that both the local unit and the court have authority over employment matters neither inherently violates the constitutional separation of powers nor infringes on the court's inherent powers. Accordingly, a coemployer relationship between two different branches is not facially constitutionally infirm.

Here, under § 593a, the county and the court are coemployers for purposes of the PERA. Section 593a provides roles for both the local unit and the court in collective bargaining; thus, there is, in fact, more than one "public employer" for purposes of the PERA. See *St Clair Prosecutor, supra* at 233. Contrary to the JAA and the GAA's assertion, the chief judge and the court will be bound by any collective bargaining agree-

ment—or at least would have before the majority transformed § 593a. Subsection 593a(4)(b) requires that the county and the chief judge concur in the decision to enter into a collective bargaining agreement. Because the division of general authority to set terms of employment applies only to personnel policies and procedures established under subsection 4(a), not collective bargaining agreements entered into under subsection 4(b), subsection 593a(5) does not limit the range of issues subject to collective bargaining. Accordingly, the co-employer status set forth in Act 374 does not impose an undue burden on the collective bargaining process, in my judgment.

Further, the GAA asserts that its members cannot assert their PERA rights because the court cannot be bound by the collective bargaining agreement under the terms of Act 374. According to the GAA, Act 374 establishes a de facto coemployer relationship between Wayne County and the court but at the same time creates a de jure prohibition against recognition of this relationship. Subsection 593a(9) states that the "state" is not a party to the contract. Plaintiff GAA contends the court is clearly a state entity under Const 1963, art 6, § 1 and, therefore, cannot be recognized as a party to the collective bargaining agreement.[26] The goal in interpreting statutes is to give effect to the intent of the Legislature. *VanGessel v*

---

[26] The fallacy of this contention may be made at least partly clear by noting that at no time have the employees of the circuit or district courts been paid by state warrants; they have always been paid by drafts or checks drawn on local accounts. A court can be an arm of the state without concomitantly requiring that court employees be regarded as state employees.

*Lakewood Public Schools,* 220 Mich App 37, 40; 558
NW2d 248 (1996). Particular provisions of a statute
should be read in the context of the entire statute. *Id.*
at 41. Subsection 593a(9) states that the chief judge
of the Third Circuit Court is the "principal administra-
tor of the officers and personnel of the court,"
although he is not a representative of a source of
funding. Subsection 593a(8) states that the chief
judge is to exercise his authority in accordance with
any applicable collective bargaining agreement. Sub-
section 593a(4)(b) states that the county, "in concur-
rence with the chief judge of the appropriate court"
has authority to enter into collective bargaining agree-
ments. As evidenced by the limits placed on the chief
judge's authority and the requirement that the chief
judge and the county concur in any collective bar-
gaining agreement, the Legislature clearly intended
that the courts be bound by the collective bargaining
agreements even though the "state" is not a party to
the contract. Accordingly, because the statute does
not limit plaintiffs' members ability to collectively
bargain over all the terms and conditions of their
employment and ensures that the court and the chief
judge will be bound by any resulting agreement,
§ 593a is not, in my judgment, inconsistent with the
PERA.[27]

---

[27] If Act 374 *were* inconsistent with the PERA, Act 374 would not, on
that basis alone, be invalid. Rather, Act 374 would likely effect an amend-
ment by implication of the PERA, to the extent of any conflict. See *Washte-
naw Co Rd Comm'rs v Public Service Comm,* 349 Mich 663, 680; 85 NW2d
134 (1957); *Antrim Co Social Welfare Bd v Lapeer Co Social Welfare Bd,*
332 Mich 224, 228; 50 NW2d 769 (1952); *Atlas v Wayne Co Bd of Audi-
tors,* 281 Mich 596, 599; 275 NW 507 (1937).

For these reasons, I, like the majority, would reverse the orders of the trial court determining that Act 374 violates the Headlee Amendment in both Docket No. 201850 and Docket No. 201852. However, in Docket No. 201852, I would also reverse the part of the trial court's order finding that Act 374 violates the constitutional separation of powers and I would affirm the part of the order finding that Act 374 does not violate the PERA.